Filed 7/11/14   Certified for publication 7/21/14 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064276 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE323881) |
| DARRELL L. CHENAULT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Allan J. Preckel, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

Darrell L. Chenault appeals a judgment following his jury convictions on 13 counts of lewd acts on a child under 14 years of age (Pen. Code, § 288, subd. (a))[1] and two counts of forcible lewd acts on a child under 14 years of age (§ 288, subd. (b)). On appeal, he contends: (1) the trial court abused its discretion by allowing a support dog[2] to be present during the testimony of two child witnesses without individualized showings of necessity; and (2) the presence of the support dog was inherently prejudicial and violated his federal constitutional rights to a fair trial and to confront the witnesses against him. Because we conclude the trial court did not abuse its discretion by allowing the support dog to be present during the testimony of the two child witnesses, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Counts 1 through 12.* Chenault and his wife Sh. had two daughters, V. and S., and an older son, B. S. was born in 1989 and V. was born in 1991. In or about 1993, Chenault and Sh. were divorced and Sh. received custody of their children. When the children visited Chenault on weekends, he would sleep on one mattress of a trundle bed with one of the children and the other two would sleep on the other mattress.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] We adopt the term "support dog," which is used by the parties, without deciding what term is most appropriately used when a dog is present to assist or enable a witness to testify. (See, e.g., *State v. Dye* (Wash. 2013) 309 P.3d 1192, 1195, 178 Wash.2d 541, 545, fn. 4 [court adopts term "facility dog," rather than alternative terms "comfort dog," "therapy dog," or "support dog"]; *State v. Devon D.* (Conn.App. 2014) ___ A.3d ___, ___, 150 Conn.App. 514, 539, fn. 10 [discussing alternative terms for support dogs and choosing as its preferred term, "facility dog"].)

When V. was about six years old, Chenault told her to sleep without underwear and, on more than one occasion, touched and rubbed her vagina while they slept in the same bed. On around five subsequent occasions, Chenault inserted his fingers into V.'s vagina. When V. was seven years old, Chenault inserted his penis into her vagina on five or fewer different occasions. On two or three occasions, he penetrated V.'s anus with his penis. On one or two occasions when V. tried to resist and turn away as he touched her, Chenault got mad, hit V., and forced her to submit to him. V. did not tell anyone about the abuse because she was afraid of how others would react.

When S. was five or six years old, Chenault told her to sleep without underwear and "checked" her vaginal and breast areas even though she had not complained of any problems. On about five different occasions when S. was eight or nine years old, she woke up and found Chenault digitally penetrating her vagina. S. did not tell her siblings because she wanted to protect them.

When S. was about 10 years old, she woke up and found Chenault penetrating her anus with his penis while in a "spooning" position behind her. She rolled over and saw his erect penis. S. suffered anal pain thereafter. When S. was 10 or 11 years old, Chenault penetrated her anus again. Thereafter, S. made excuses not to visit Chenault, but did not tell anyone about the abuse because she wanted to protect her siblings. Also, because Chenault told S. stories about things he had gotten away with, she believed child protective service workers could not help her.

In 2000, Sh. entered into a relationship with C.M., who helped raise V. and S. Before Chenault's scheduled visitations with his children, C.M. noticed S. became visibly distraught. S. told her she did not want to go, hated Chenault, and wanted nothing to do with him.

In late 2000 or early 2001, C.M. asked S. whether Chenault had ever touched her inappropriately and made S. promise to tell the truth. S. turned away and cried. C.M. said that was all she needed to know. Later, S. approached C.M., asked her how she knew, and then described Chenault's sexual abuse of her.

On one occasion, while they were away on a trip, Sh. and C.M. allowed Chenault to stay overnight in their home with the children. On their return the next morning, C.M. saw Chenault lying behind V. on the floor of the children's bedroom. V. was wearing only her underwear, and Chenault had his arm around her with his hand at her panty line. C.M. immediately told Sh. what she saw and that Chenault needed to leave. C.M. told Chenault she would break his knees if he ever came near V. or S. again.

Rather than subject V. and S. to legal proceedings, Sh. and C.M. moved out of state with the children. While living in Illinois, V. learned Chenault had also sexually abused S. Between 2006 and 2011, V. and S. spoke with Chenault on the telephone to reach their grandmother, ask about her, or ask for financial assistance, but they never discussed their abuse with him. In 2011, Chenault stopped giving V. and S. financial assistance. In 2012, V. first reported Chenault's abuse to Detective Paul Ward.

4

*Counts 13 through 15.*  Cr.C. is Chenault's niece.  Cr.C. had four daughters, including C., born in 1999, and F., born in 2001.  Before 2010, Chenault began residing with Cr.C.'s grandmother.  When her grandmother became ill in 2010, Cr.C. communicated with Chenault more frequently because she had to ask him for financial assistance from her grandmother.  She also took her daughters to visit her grandmother more frequently.  Chenault was usually home during their visits with the grandmother.

When Cr.C.'s grandmother became hospitalized, Chenault asked Cr.C. if C. and F. could come over and help him go through her grandmother's personal property.  When F. was eight or nine years old, she spent the night alone with Chenault.  F. changed into her nightgown and appeared to fall asleep on the couch.  Chenault sat on the couch, put her feet on his lap, and removed her underwear.  He took her underwear to the bathroom and returned to the couch.  F. kept her eyes closed, pretending to be asleep.  Chenault rubbed F.'s leg and vagina and then inserted his finger into her vagina.  Chenault then went to sleep elsewhere.  The following morning, Chenault asked F. if she found her underwear in the bathroom.  At church later that morning, Chenault placed his hand on F.'s thigh and rubbed it.  F. did not tell anyone about Chenault's actions because she thought she might get in trouble.

A couple of nights later, F. and C. spent the night at Chenault's home.  He set up an air mattress on the living room floor for the girls to sleep on.  While Chenault was in the kitchen, F. and C. went to sleep.  F. was wearing pajama bottoms and underwear.  Chenault approached F. and tried to pull off her pajama bottoms, but she had a tight grip

5

on them. He then put his hands inside her pajama bottoms, lifted up her underwear, and touched her vagina. He put his finger inside her vagina.

C. woke up when her blanket was pulled off of her back. Chenault pulled C.'s underwear down to her ankles and inserted his finger into her anus while she was lying on her stomach. After Chenault walked away, C. pulled up her underwear and covered herself with her blanket. She eventually fell asleep, but later awoke, ran to the bathroom, and vomited.

On arriving home, F. and C. told each other what Chenault had done to them. After their great grandmother died, F. and C. told their stepfather and then their mother (Cr.C.) about Chenault's sexual abuse of them. Cr.C. called her mother and then learned about Chenault's abuse of V. and S. F. and C. were subsequently interviewed by Sherri Rouse, a forensic interviewer for the Chadwick Center at Rady Children's Hospital.[3]

An amended information charged Chenault with 13 counts of lewd acts on a child under 14 years of age (§ 288, subd. (a)) and two counts of forcible lewd acts on a child under 14 years of age (§ 288, subd. (b)). The information also alleged Chenault committed offenses described in section 667.61, subdivision (c), against more than one victim within the meaning of the One Strike Law (§ 667, subds. (b), (c), (e)). It further alleged that in committing each of the offenses Chenault had substantial sexual contact with a child under 14 years of age (§ 1203.066, subd. (a)(8)). It further alleged that in

---

[3] A video recording of F.'s interview was played for the jury at trial.

6

committing counts 1 through 12 Chenault committed the section 288 offenses within the meaning of section 801.1, subdivision (a).

At trial, the prosecution presented testimony substantially as described above. It further presented the expert testimony of Catherine McLennan regarding the behavior of children who are victims of sexual abuse. She testified that delayed disclosure by such victims was extremely common. Studies have shown two-thirds of victims had never told anyone about their sexual abuse and kept it a secret even as adults. In her clinical experience, most child victims wait for a period of time before telling anyone about the sexual abuse. Their reasons for delaying disclosure include embarrassment, shame, feeling partially responsible for the abuse, loyalty to the abuser and not wanting to get the abuser into trouble, and concerns about the negative consequences of disclosure, including not being believed, upsetting family situations, or being removed from the home. Child victims commonly continue to spend time with their abusers and may make partial disclosures before divulging more details. Children, especially young children, often have difficulty recalling the timing of events.

In his defense, Chenault presented the testimony of Detective Ward, who described what he observed during Rouse's interview of C. C. told Rouse that during a telephone call on Thanksgiving Day, her stepfather told her that, "If someone's touching you, you're supposed to tell us [her parents]." After C. and F. disclosed Chenault's sexual abuse of them, their stepfather told C. to hand the telephone to her mother. Ward also explained why there had been a delay from the time he was assigned to investigate the

7

case in December 2010 until the time he sent a report to the District Attorney's office in April 2012, citing a shortage of funding and deputies in his unit to handle a tremendously increasing caseload.

The jury found Chenault guilty on all 15 counts and found true all of the sections 667.61 and 1203.066 allegations.[4] The trial court sentenced Chenault to a total term of 75 years to life in prison, consisting of five consecutive terms of 15 years to life for counts 3, 4, 11, 13, and 15, and concurrent terms of 15 years to life on the remaining counts. Chenault timely filed a notice of appeal.

DISCUSSION

I

*Presence of a Support Dog*

Chenault contends the trial court abused its discretion by allowing a support dog to be present during the testimony of F. and C. without individualized showings of necessity. He argues the presence of the support dog was inherently prejudicial and violated his federal constitutional rights to a fair trial and to confront the witnesses against him.

A

At the time of trial, F. was 11 years old and C. was 13 years old. Before trial, the prosecutor filed a trial brief that requested F. and C. be permitted to have a support dog

---

[4] Before trial, Chenault admitted the truth of the section 801.1, subdivision (a), allegations.

present during their testimony in addition to a support person.  Citing the trial court's

discretion under Evidence Code section 765, subdivision (b), the prosecutor asked the

court to allow F. and C., who were under 14 years of age, to use a dog trained in

providing support.  She represented the dog was "a trained service dog that will not

disrupt the courtroom and has been inside the court in the past.  In fact, the trained

service canine sought to be used in this case has been providing support for victims and

witnesses in San Diego County for the last several years."  She argued: "Young victims

are often very nervous and scared to testify on the witness stand.  This is quite

understandable given the facts and nature of these cases.  The use of a support canine

would surely aid the victims in giving their testimony.  Support canines have proven very

effective in making children feel safer to recall past traumatic events, speak in front of

strangers, and give clearer testimony."  To avoid prejudice to the defendant or distraction

of the jury, the prosecutor suggested the support dog walk in with F. and C., sit under the

witness stand during their testimony, and then leave with them after they completed their

testimony.

The trial court granted the prosecutor's request to allow a support dog to be present

during the testimony of F. and C.  The court stated:

> "Yes.  We may talk more about that as we go along, because I would
> expect that the K-9's presence, so to speak, would be limited to
> actually accompanying [F.] and [C.] to the witness stand and then
> kind of playing lap dog at their feet.  But one thing I don't want is for
> [F.] and/or [C.]  and said support animal to be wandering the
> hallway out here on any recesses with pats on the head by everyone
> [who] loves dogs, including jurors.

9

"Okay. So, yes, I'll accommodate that request, but I would expect everyone is understanding of the Court's expectations in that regard."

Chenault's counsel later asked the court to reconsider its ruling and urged it to not allow the dog in the courtroom. She explained:

"The reason for my request is as follows: These aren't little kids. They're tweens. They are currently 11 and 13. They have talked about this case to police, to social workers at Children's Hospital. They've talked about the case to the prosecutor. They came to court and testified at the preliminary hearing without any problem at all.

"The first time the issue of using the dog came up is when it was offered to them at [the] preliminary hearing, they said, 'Yes, we'd like the dog.'

"At that time the dog was disallowed on the grounds of the age of the children and the fact the children didn't ask for the dog, but the idea of the dog had been suggested to them by the prosecution.

"My problem with the dog is this: People look at a dog and they immediately -- most people -- many people experience very warm, loving, good feelings about the dog, and they're going to translate those feelings to the child that's testifying. It will be hard for some jurors to separate the fact of the dog, and looking at the child critically and analytically and trying to decide if the child is telling the truth, particularly in a case like this, where the stakes are so high. I worry that the dog will be a distraction, and I don't see a need for the dog when we do have support people in court."

The trial court replied:

"Well, I'm sensitive to some of your concerns as expressed, . . . but I've also seen the support animals in operation, and I know how stressful testifying in an environment such as this usually is, especially for children of a tender age.

"And yes, they've had to talk about it and retell it and tell it again, which perhaps is an argument in favor of a support animal rather than against it.

10

"But I respect your argument and concern, and I'm sure that I'll be talking to the jurors a little bit about the reason for the support animal and also saying something along the lines of seeking to assuage the concerns that you've just expressed, that, you know, I'm not going to get down from the bench and kick the support animal in the ribs, but the support animal, I think, has a place in a proceeding such as this.

"And in my experience, typically the support animal is at the feet of the witness in the witness stand, concealed out of view of the jurors. So they'll likely see it when it comes in, when [F.] or her sister take the witness stand, and probably see it again when it marches out at the close of each witness'[s] testimony.

"But I'm sensitive to the concerns that you've expressed, but I don't believe that there's anything out of bounds in permitting, within proper parameters, the support animal's presence.

"And we're only talking, of course, about the testimony of the two minor victims [i.e., F. and C.], who are still minors. We're not talking about the now adult victims [i.e., V. and S.], as charged in Counts 1 through 12."

The court denied Chenault's request for reconsideration.

Before jury selection, the trial court set forth the logistics for the presence of the support dog, stating the jury would take a recess before F. or C. took the stand and then during that recess F. or C. would enter the courtroom with the support dog and its handler through the back hallway. After the witness took the stand with the support dog, the jury would reenter the courtroom. The court indicated that procedure would minimize, if not eliminate, "any untoward prejudice that might otherwise inure against Mr. Chenault."

Before F.'s testimony, the prosecutor informed the trial court the support dog's handler would need to be seated where the dog could see the handler to ensure it did not stand up or otherwise misbehave. The court stated the handler could sit in a chair near

11

the back door. After F. took the stand with the support dog, Chenault's counsel complained that "the dog is on the floor here," apparently within the jury's view.[5] The court explained the support dog was located there "because of the size of the dog and the space available."

When the jury entered the courtroom after the recess, the trial court told them:

> "The People's next witness is [F.], who is already on the witness stand.
>
> "And, ladies and gentlemen, [F.] and her sister [C.] in turn, will be accompanied by a service animal, companion dog, whose [name] happens to be Asta.
>
> "The law permits the Court to make reasonable accommodations for child witnesses, and accordingly, I've granted the request for Asta to be present during the testimony of [F.] and [C.]
>
> "And Asta will otherwise be a nonparticipant. And, frankly, I often find myself having more problems with two-legged animals than the four-legged variety."

F. then testified. The record does not reflect any problems caused by the support dog during F.'s testimony.

The same procedures for the support dog's presence apparently were followed before C.'s testimony. The record does not reflect any problems caused by the support dog during C.'s testimony.

---

[5]     Because Chenault's counsel did not specify, and the record does not otherwise show, where the support dog was located, we cannot conclude the dog was, in fact, within the view of all of the jurors or whether the dog could be viewed by the jurors at all times or only on entering the courtroom. Nevertheless, for purposes of this appeal, we presume the support dog was within the view of the jurors at all times.

12

B

Although section 868.5[6] expressly provides for the presence of one or two support

persons for a witness in certain circumstances, that statute does not apply to the presence

of therapy or support dogs. (*People v. Spence* (2012) 212 Cal.App.4th 478, 516-517

(*Spence*).) Rather, a trial court has authority under Evidence Code section 765 to allow

the presence of a therapy or support dog during a witness's testimony. (*Spence*, at

pp. 516-517.) Evidence Code section 765 provides:

> "(a) The court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment.
>
> "(b) *With a witness under the age of 14* or a dependent person with a substantial cognitive impairment, *the court shall take special care to protect him or her from undue harassment or embarrassment*, and to restrict the unnecessary repetition of questions. . . ." (Italics added.)

---

6    Section 868.5 provides in part: "(a) . . . [A] prosecuting witness in a case involving a violation or attempted violation of Section . . . 288 . . . , shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, one of whom may be a witness, at the preliminary hearing and at the trial . . . during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony. . . ." Section 868.5, subdivision (b), provides that if the support person is also a prosecuting witness, the prosecution must present evidence that the support person's presence is "both desired by the prosecuting witness for support and will be helpful to the prosecuting witness. Upon that showing, the court shall grant the request unless information presented by the defendant or noticed by the court establishes that the support person's attendance during the testimony of the prosecuting witness would pose a substantial risk of influencing or affecting the content of that testimony."

13

"A trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice. (See, e.g., § 1044;[7] Evid. Code, § 765; [citations].)" (*People v. Cox* (1991) 53 Cal.3d 618, 700.) The trial court has broad discretion under Evidence Code section 765 to exercise control over interrogation of witnesses and protect them from undue harassment or embarrassment. (*People v. Tafoya* (2007) 42 Cal.4th 147, 175; *Spence*, *supra*, 212 Cal.App.4th at p. 517.) On appeal, we apply the abuse of discretion standard in reviewing a trial court's exercise of its authority under Evidence Code section 765. (*Tafoya*, at p. 175; *Spence*, at p. 517.)

## C

Chenault asserts the presence of the support dog during F. and C.'s testimony was inherently prejudicial and violated his federal constitutional rights to a fair trial and to confront the witnesses against him.

In the context of section 868.5 support persons, "[c]ase law uniformly rejects arguments that section 868.5 is inherently prejudicial, erodes the presumption of innocence, and impermissibly encroaches on confrontation clause and due process clause rights. (See e.g., *People v. Johns* (1997) 56 Cal.App.4th 550, 553-556 [65 Cal.Rptr.2d 434] [(*Johns*)]; *People v. Adams* (1993) 19 Cal.App.4th 412, 435-444 [23 Cal.Rptr.2d 512] [(*Adams*)]; *People v. Patten* (1992) 9 Cal.App.4th 1718, 1725-1733 [12 Cal.Rptr.2d

---

7    Section 1044 provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

14

284] (*Patten*).)" (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1077.) The California Supreme Court also stated: "Absent improper interference by the support person, . . . no decision supports the proposition that defendant advances here, that the support person's mere presence infringes his due process and confrontation clause rights." (*People v. Myles* (2012) 53 Cal.4th 1181, 1214.)

We do not believe the presence of a support dog is inherently more prejudicial than the presence of a support person. Another court stated: "[P]ermitting a comfort dog to accompany a child victim to the stand during testimony can be considered less prejudicial than allowing 'support persons.' " (*People v. Tohom* (N.Y.App. 2013) 109 A.D.3d 253, 272, 969 N.Y.S.2d 123, 137 (*Tohom*).) Citing only "reason and common human experience," Chenault argues the presence of a support dog will cause a jury to decide a defendant's guilt based on impermissible factors. He argues "the one[-]sided deployment of a universally beloved animal distracts the jury from a dispassionate review of the evidence and unfairly bolsters the prosecution's case by aligning witnesses with a powerful symbol of trustworthiness and vouching for their credibility as victims." Although it is possible in certain circumstances that a support dog might cause a jury to consider impermissible factors in deciding a defendant's guilt, we conclude that scenario will not necessarily, and likely will only rarely, result when a support dog is used to comfort a testifying witness. Any purported impermissible consideration by a jury of a support dog's presence must be determined based on the facts and circumstances in a particular case.

15

We disagree with Chenault's apparent assertion that a jury will necessarily infer from the presence of a support dog that the witness is a victim so traumatized by the crimes allegedly committed by the defendant that he or she cannot testify without a support dog and therefore is more credible than if that witness is not accompanied by a support dog. Because Chenault does not persuade us the presence of a support dog is inherently prejudicial or necessarily more prejudicial than the presence of a support person, we apply the reasoning and holdings in the section 868.5 support person cases to this case and conclude the presence of a support dog pursuant to a trial court's authority under Evidence Code section 765 likewise is not inherently prejudicial and does not, as a matter of law, violate a criminal defendant's federal constitutional rights to a fair trial and to confront witnesses against him or her. (*People v. Myles*, *supra*, 53 Cal.4th at p. 1214; *People v. Ybarra*, *supra*, 166 Cal.App.4th at p. 1077; *Johns*, *supra*, 56 Cal.App.4th at pp. 553-556; *Adams*, *supra*, 19 Cal.App.4th at pp. 435-444; *Patten*, *supra*, 9 Cal.App.4th at pp. 1725-1733.)

D

Chenault also asserts the trial court abused its discretion under Evidence Code section 765 by allowing a support dog to be present during the testimony of F. and C. without individualized showings of necessity. Citing *Adams*, *supra*, 19 Cal.App.4th 412, he argues his federal constitutional right to due process required findings by the trial court that F. and C. each needed the presence of a support dog before the court could allow its presence. Relying on *Maryland v. Craig* (1990) 497 U.S. 836, which involved

16

the testimony of a child witness by closed-circuit television, and *Coy v. Iowa* (1988) 487

U.S. 1012, which involved the placement of a screen between the defendant and the child

witnesses, *Adams* concluded the federal Constitution requires a trial court make a case-

specific finding that an individual witness has a *need* for the presence of a support person

before it may grant a section 868.5 request.  (*Adams*, at pp. 443-444.)  However, as other

courts have concluded, the presence of a support person is different in kind from the

specialized procedures challenged in *Maryland* and *Coy* (e.g., testimony of a child

witness by closed-circuit television; placement of a screen between the defendant and the

child witnesses).  (*People v. Lord* (1994) 30 Cal.App.4th 1718, 1722 ["The use of a

support person, unlike testimony on one-way closed circuit television, does not deny a

face-to-face confrontation, and thus does not implicate the type of constitutional showing

required in *Maryland*."]; *Patten*, *supra*, 9 Cal.App.4th at p. 1727 [distinguishing the use

of a support person from *Maryland* and other cases that involved procedures that

inherently infringed on a constitutional right]; *Johns*, *supra*, 56 Cal.App.4th at p. 556,

citing *Patten* with approval.)

Because we believe in the context of the federal Constitution the presence of a

support dog under Evidence Code section 765 is not significantly different from the

presence of a support person under section 868.5, we disagree with the reasoning in

*Adams* and conclude a case-specific finding that an individual witness *needs* the presence

of a support dog is not required by the federal Constitution.  (Cf. *Tohom*, *supra*, 109

A.D.3d at p. 266, 969 N.Y.S.2d at p. 133 [rejecting argument that trial court was required

17

to make a finding of necessity (i.e., child witness needed the support dog to be able to testify) before allowing the presence of the support dog]; *State v. Devon D.*, *supra*, ___ A.D.3d at p. ___, 150 Conn.App. at pp. 538, 549 [contra].)

Instead of requiring a case-specific finding that an individual witness needs the presence of a support dog, we conclude that in exercising its discretion under Evidence Code section 765, a trial court should consider the particular facts of the case and the circumstances of each individual witness and determine whether the presence of a support dog would assist or enable that witness to testify without undue harassment or embarrassment and provide complete and truthful testimony.[8] In so doing, the court should focus on whether the presence of the specific support dog would likely assist or enable the individual witness to give complete and truthful testimony by reducing the stress or trauma the witness may experience while testifying in court or otherwise minimizing undue harassment or embarrassment. If the trial court finds the presence of a

---

[8] Because we concluded above that the trial court's exercise of discretion under Evidence Code section 765 to allow the presence of a support dog is not inherently prejudicial to a defendant and does not, in general, violate a defendant's federal constitutional rights to a fair trial and to confront witnesses, we decline to adopt a standard that requires the prosecution to show a "need" or "necessity" for the presence of the support dog. (Cf. *Spence*, *supra*, 212 Cal.App.4th at p. 518; *Adams*, *supra*, 19 Cal.App.4th at pp. 443-444; *State v. Dye*, *supra*, 309 P.3d at p. 1199, 178 Wash.2d at pp. 553-554.) Furthermore, to the extent that alternative standard requires the prosecution to prove a specific witness will be unable to testify unless a support dog is present, we disagree with that interpretation of the terms "need" and "necessity" as applied in the context of the trial court's exercise of discretion under Evidence Code section 765 to allow the presence of a support dog during an individual witness's testimony. In that context, we believe the appropriate standard should be whether the presence of a support dog would assist or enable that witness to completely and truthfully testify without undue harassment or embarrassment.

18

support dog would likely assist or enable the individual witness to give complete and truthful testimony and the record supports that finding, the court generally will act within its discretion under Evidence Code section 765 by granting a request for the presence of the support dog when that witness testifies.

Nevertheless, the court should also take appropriate measures to reduce, if not eliminate, any prejudice to the defendant possibly caused by the presence of the support dog during the witness's testimony. For instance, the court should attempt to make the presence of the support dog as unobtrusive and least disruptive to the proceedings as reasonably possible. The court may have the jury recess while the witness takes the stand and the support dog enters and is positioned, and then recess again before the witness and dog leave the courtroom. In certain physical courtroom settings, it may be possible to have the support dog lie on the floor near the witness, entirely out of the jurors' view. If not, the support dog should be positioned, if possible, so its presence is not significantly distracting to the jurors.

Furthermore, whenever the support dog's presence becomes known, or is likely to become known, to the jury, it generally will be the preferred practice for the court to give an appropriate admonishment to the jury to avoid, or at least minimize, any potential prejudice to the defendant. For example, the court may admonish the jury that it should disregard the dog's presence and decide the case based solely on the evidence presented, should not consider the witness's testimony to be any more or less credible because of the dog's presence, and should not be biased either for or against the witness, the prosecution,

19

or the defendant based on the dog's presence.[9]  In the event the trial court finds the prejudice to the defendant cannot be eliminated, or at least reduced to a level that does not infringe on the defendant's constitutional rights to a fair trial and to confront witnesses, the court generally should exercise its discretion by denying the request for the presence of a support dog.

We reject Chenault's argument that we should adopt and apply the standard for the presence of support dogs recently set forth by the Washington Supreme Court in *State v. Dye*, *supra*, 309 P.3d 1192, 1199, 178 Wash.2d 541, 553 ["[W]here special courtroom procedures implicate constitutional rights, it is not the defendant's burden to prove that he or she has been prejudiced, but the prosecution's burden to prove that a special dispensation for a vulnerable witness is necessary. . . .  However, we do not require a showing of 'substantial need' or 'compelling necessity' . . . .  [W]e will not overrule the trial court's exercise of discretion unless the record fails to reveal the party's reasons for needing a support animal, or if the record indicates that the trial court failed to consider those reasons."].)

Chenault argues the trial court abused its discretion under Evidence Code section 765 because it made only generalized findings that support dogs assist child witnesses and did not specifically find the support dog in this case would assist or enable F. and C. to testify.  However, contrary to Chenault's assertion, we conclude the record shows the trial court made implicit findings the support dog would assist F. and C. to testify

---

9    For one example of an appropriate admonition, see *Tohom*, *supra*, 109 A.D.3d at page 259, 969 N.Y.S.2d at page 128.

20

completely and truthfully. As discussed above, the prosecutor requested the presence of the support dog for F., then 11 years of age, and C., then 13 years of age. She represented the specific dog to be used was "a trained service dog that will not disrupt the courtroom and has been inside the court in the past. In fact, the trained service canine sought to be used in this case has been providing support for victims and witnesses in San Diego County for the last several years." She argued the use of the support dog "would surely aid the victims in giving their testimony," presumably referring to F. and C. She also argued that, in general, "[y]oung victims are often very nervous and scared to testify on the witness stand [and] . . . [s]upport canines have proven very effective in making children feel safer to recall past traumatic events, speak in front of strangers, and give clearer testimony." Furthermore, to avoid prejudice to Chenault, the prosecutor suggested the support dog walk in with F. and C., sit under the witness stand during their testimony, and then leave with them when they completed their testimony.

The trial court granted the prosecutor's request, stating it expected the presence of the support dog to be "limited to actually accompanying [F.] and [C.] to the witness stand and then kind of playing lap dog at their feet." Chenault's counsel later requested reconsideration of that ruling, arguing F. and C. were not "little kids," had previously talked to police, social workers, and the prosecutor about the case, and testified at the preliminary hearing "without any problem at all" without the presence of the support dog. She further argued the presence of the support dog would be prejudicial to Chenault because most people (presumably including most jurors) view dogs favorably and thus,

21

by association, would view F. and C. favorably as well. The trial court replied that it was sensitive to those concerns, but knew "how stressful testifying in an environment such as this usually is, especially for children of a tender age" and noted F. and C. have "had to talk about it and retell it and tell it again, which perhaps is an argument in favor of a support animal rather than against it." The court denied the request for reconsideration.

To minimize, if not eliminate, any potential prejudice to Chenault, the trial court adopted specific procedures for the support dog to be as unobtrusive and least distracting as possible. When the jury was in recess, the support dog and its handler were to enter with F. and C. through the back hallway and they would get situated before the jury reentered the courtroom. The dog's handler would sit in a chair near the back door. However, when the support dog entered and was situated before F.'s testimony, Chenault's counsel complained that "the dog is on the floor here," apparently noting for the record that the dog was within the jury's view. The court explained the support dog was located there "because of the size of the dog and the space available."

When the jury entered the courtroom after the recess, the trial court told them that Asta, a companion dog, would be accompanying F. and C. during their testimony, explaining:

> "The law permits the Court to make reasonable accommodations for child witnesses, and accordingly, I've granted the request for Asta to be present during the testimony of [F.] and [C.]
>
> "And *Asta will otherwise be a nonparticipant*. And, frankly, I often find myself having more problems with two-legged animals than the four-legged variety." (Italics added.)

22

F. then testified without any apparent problems caused by the support dog during her testimony. The same procedures for the support dog's presence apparently were followed before C.'s testimony. C. also testified without any apparent problems caused by the support dog.

Based on our review of the record, we conclude the trial court made implicit findings that the presence of Asta, the support dog, would assist or enable F. and C. to testify completely and truthfully without undue harassment or embarrassment. The court also took measures to reduce any possible prejudice to Chenault by setting forth logistics for the entry, positioning, and departure of the support dog, along with F. and C., during jury recesses so the dog was as unobtrusive and least disruptive as reasonably possible. (Cf. *Spence*, *supra*, 212 Cal.App.4th at p. 517 ["[T]he trial court took care to ensure that the therapy dog would be mainly unnoticeable once everybody took their seats, and that corrective action would be taken if there was a problem . . . ."].) The court also instructed the jury (albeit not as specifically as we discussed above), that the law allowed the presence of the support dog during the testimony of F. and C., as child witnesses, and that the dog "will otherwise be a nonparticipant." Because the trial court implicitly found the presence of the support dog would likely assist or enable F. and C. to testify completely and truthfully without undue harassment or embarrassment and took steps to minimize any prejudice to Chenault, we conclude the court did not abuse its discretion under Evidence Code section 765 by allowing the presence of the support dog during F.'s and C.'s testimony.

23

Chenault does not persuade us to reach a contrary conclusion. First, although express findings on the record are the preferred practice, we disagree with his apparent assertion that a trial court abuses its Evidence Code section 765 discretion unless it makes sufficient findings in support of its decision expressly on the record. Rather, if there is sufficient evidence on the record to support the required findings, we conclude implicit findings may be adequate to support the trial court's exercise of its discretion under Evidence Code section 765 to allow the presence of a support dog. (Cf. *Spence*, *supra*, 212 Cal.App.4th at p. 518 ["the court's implied findings of necessity were justified"]; *State v. Dye*, *supra*, 309 P.3d at p. 1199, 178 Wash.2d at p. 554 ["[T]he trial court's 'implicit' finding of necessity was sufficient."].) Furthermore, contrary to Chenault's suggestion, the fact another trial judge previously denied the prosecutor's request for the presence of the support dog during F.'s and C.'s testimony at the preliminary hearing does not show the trial judge presiding over Chenault's trial abused its discretion by allowing the support dog to be present during their trial testimony. Likewise, contrary to Chenault's suggestion, the fact F. and C. were able to talk to police, social workers, and the prosecutor about the case before trial, and testified at the preliminary hearing, all without the presence of a support dog, does not show the trial court abused its discretion by allowing the support dog to be present during their trial testimony. Furthermore, contrary to Chenault's assertion, we conclude F. and C. did, in fact, request the presence of a support dog during their trial testimony. Although we assume, as Chenault represents, they did not request the presence of a support dog for their *preliminary*

*hearing testimony* until the prosecutor suggested one, the prosecutor represented before trial that F. and C. had requested the presence of a support dog for their *trial testimony*. Absent any affirmative indication in the record showing otherwise, we accept as true the prosecutor's representation to the trial court.

Finally, contrary to Chenault's assertion, there is nothing about the ages of F. and C. (i.e., 11 and 13 years of age) that precluded the trial court from finding they were children under 14 years of age whose complete and truthful trial testimony would, in fact, likely be assisted or enabled by the presence of a support dog. Contrary to Chenault's assertion, the trial court considered all of the circumstances he cited that weighed against allowing the support dog and nevertheless properly exercised its discretion by implicitly finding the presence of the support dog would likely assist or enable F. and C. to testify completely and truthfully without undue harassment or embarrassment. Chenault has not carried his burden to show the trial court abused its discretion under Evidence Code section 765 by allowing a support dog to be present during the testimony of F. and C.

E

Assuming arguendo the trial court abused its discretion by allowing the presence of the support dog during F.'s and C.'s trial testimony, we nevertheless conclude that error was harmless. Because Chenault merely speculates, and does not persuade us, that his federal constitutional rights to a fair trial and to confront witnesses were violated by the presence of the support dog in the circumstances of this case, we apply the state standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. In this case, the

presence of the support dog during F.'s and C.'s trial testimony was, at most, mere trial error, and not a fundamental structural defect, and therefore requires the application of *Watson*'s less stringent standard of prejudice. (Cal. Const., art. VI, § 13; *People v. Breverman* (1998) 19 Cal.4th 142, 173-178; *People v. Cahill* (1993) 5 Cal.4th 478, 501.) The error is harmless unless an examination of the entire record shows it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, at p. 836.)

Based on our review of the entire record, we conclude it is not reasonably probable Chenault would have obtained a more favorable result had the trial court not allowed the presence of a support dog during F.'s and C.'s trial testimony. Importantly, the jury found Chenault guilty on counts 1 through 12, none of which involved F. or C. Rather, those counts involved V. and S., whose testimony was presented at trial without the presence of a support dog. Because the jury found V.'s and S.'s testimony credible without the presence of a support dog, it is unlikely the jury would have found F.'s and C.'s testimony was not credible had the support dog not been present during their testimony. F.'s and C.'s testimony described circumstances and acts by Chenault quite similar to those described by V. and S., thereby supporting the jury's inference that F.'s and C.'s testimony was credible.

Also, the trial court admonished the jury the support dog was not a participant in the proceedings, effectively instructing the jury it should not consider the presence of the support dog in weighing the evidence and deciding the merits of the case. Although, as

26

Chenault asserts, a more complete admonition by the trial court would have been preferred, the absence of a more complete admonition does not show the jury improperly considered the presence of the support dog in determining his guilt of the offenses charged in counts 13 through 15. Furthermore, the trial court gave other instructions that informed the jury of its role in properly weighing the evidence and deciding Chenault's guilt of the charged offenses. (See, e.g., CALCRIM No. 200 ["It is up to all of you . . . to decide what happened, based only on the evidence that has been presented to you in this trial. [¶] Do not let bias, sympathy, prejudice, or public opinion influence your decision."]; CALCRIM No. 220 ["In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the [defendant] guilty beyond a reasonable doubt, [he is] entitled to an acquittal and you must find [him] not guilty."].)

The fact that F.'s and C.'s testimony was not corroborated by physical evidence or by Chenault's admissions does not show it is reasonably probable he would have obtained a more favorable result in the absence of the support dog. Although we presume the jury could have rationally found F.'s and C.'s testimony to be not credible, as Chenault asserts, that is not the standard of prejudice we apply in this case. Rather, we examine the entire record to determine whether it is reasonably probable he would have obtained a more favorable result had the support dog not been present when F. and C. testified. Chenault does not persuade us the jury would have found their testimony to be not credible had

27

they not been accompanied by the support dog. Chenault merely speculates the presence of the support dog bolstered the credibility of F. and C. He presumes there was "emotion evoked by the presence of a support dog," but there is nothing in the record, albeit the "cold record" before us, that shows any emotion, much less improper emotion, was evoked by the dog's presence. Furthermore, the length of the jury's deliberations (i.e., about one hour five minutes) in deciding all 15 counts does not persuade us the jury found F. and C. credible because of the support dog's presence. Clearly, this case was a "credibility contest" not requiring lengthy deliberation by the jury. By finding V. and S. were credible regarding counts 1 through 12 and separately finding F. and C. were credible regarding counts 13 through 15, it is not reasonably probable the jury would have reached a more favorable result for Chenault had the support dog not been present during F.'s and C.'s testimony.

Finally, the trial court's attempt at humor did not prejudice Chenault. After admonishing the jury that the support dog was a nonparticipant, the court commented: "And, frankly, I often find myself having more problems with two-legged animals than the four-legged variety." Although it is possible to construe that comment as suggesting two-legged animals (i.e., human beings) are more likely to cause problems (e.g., commit crimes) than four-legged animals, it is not reasonably probable the jury would have inferred the trial court was referring to Chenault's tendency, as opposed to two-legged persons in general, to cause problems. Based on our review of the entire record, we conclude it is not reasonably probable Chenault would have obtained a more favorable

28

result had the trial court not allowed the support dog to be present during F.'s and C.'s testimony. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Alternatively stated, our confidence in the verdict is not undermined by the trial court's purported error. (Cal. Const., art. VI, § 13.)

## II

### *Abstract of Judgment*

The People assert, and we agree, the abstract of judgment does not properly reflect the trial court's oral judgment. The jury convicted Chenault on count 15 of a section 288, subdivision (a), lewd act. The trial court sentenced him to a consecutive term of 15 years to life in prison on count 15. However, the abstract of judgment omits the count 15 conviction from its section 1 listing of all of Chenault's convictions. Accordingly, an amended abstract of judgment should be issued by the court clerk correcting that omission. (*People v. Watts* (2009) 173 Cal.App.4th 621, 623, fn. 2.)

## DISPOSITION

The judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment consistent with this opinion and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

                                                        McDONALD, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

THE PEOPLE,
Plaintiff and Respondent,
v.
DARRELL CHENAULT,
Defendant and Appellant.
**D064276**
**San Diego County No. SCE323881**

THE COURT:

The opinion in this case filed July 11, 2014 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c) the People's request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

Haller

_____
Acting Presiding Justice

31