Filed 12/16/14  P. v. Maldonado CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CARLOS GENE MALDONADO,<br><br>Defendant and Appellant. | F067097<br><br>(Super. Ct. No. MCR043131)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Henry J. Valle, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

Carlos Gene Maldonado (defendant) was convicted of attempted murder and three counts of assault with a firearm.  He argues that (1) his police interview was admitted into

evidence in error because it was obtained in violation of *Miranda*;[1] (2) the prosecution was improperly permitted to ask a witness leading questions; (3) hearsay statements were improperly admitted under the exception for prior inconsistent statements when the prior statements were not really inconsistent with the live testimony; and (4) testimonial hearsay was admitted in violation of the confrontation clause of the Sixth Amendment. Finding no error, we will affirm the judgment.

## *FACTS AND PROCEDURAL HISTORY*

Madera County sheriff's deputies responded to a reported shooting at a residence in Madera on March 18, 2012. The residence consisted of a mobile home with a motor home parked behind it. Present were Scott Greer, Tamara Thomas, Tamara's mother Roshena Blakney, and Roshena's husband Ronald Blakney. The residence belonged to Roshena and Ronald,[2] who lived in the motor home. Tamara was visiting and staying in a room in the mobile home, and Scott was renting a room in the mobile home. When the deputies arrived, Scott had been shot four times and sustained life-threatening wounds in his chest, abdomen, and leg. A bullet grazed Ronald's shoulder and another grazed Roshena's neck. Tamara had a painful and swollen ankle but had not been shot. Seven shell casings were found in the yard and driveway.

Detective Bennie Romiti interviewed Tamara at the sheriff's department office on the evening of the day of the shooting. Her statement was recorded and transcribed. Tamara told Romiti that her cousin Charlie knocked at the door. Charlie's brother Timmy and another cousin named James were with him. Charlie was defendant and Timmy was his younger brother, Timothy Maldonado. Defendant was holding a gun and Tamara told

---

[1]*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]Because some of the parties share a last name, we will refer to each of them by their first names for clarity and convenience. No disrespect is intended.

him he should leave, but defendant entered anyway. Tamara smelled alcohol on defendant's breath.

Tamara ran to get her mother, and when she came back, defendant had put down his gun and he and Scott were fighting with their shirts off in front of the mobile home. Scott was winning the fight, so Timothy tried to intervene on defendant's behalf. Tamara grabbed Timothy and tried to persuade him to desist, but defendant grabbed her by the hair and pulled her away. Next, Roshena attacked defendant and he conceded his defeat by Scott. "'Yeah, you whooped my ass,'" defendant said. James, however, was now holding two guns and handed them to defendant. Then the shooting took place, which Tamara described thus: "I could just see—I just see boom, boom, boom, like this. And I heard—I heard, um, (Scott) scream like, you know, up—for pain …."[3]

In response to follow-up questions, Tamara confirmed that defendant was the shooter:

"Q: So I wanna back up. When you—you saw (James) hand [defendant] the guns, and then did you see [defendant] pulling the trigger?

"A: I seen—like this. Yes. I seen like this.

"Q: So he was just shooting ….

"A: It was just like this. And I hear (unintelligible) and then—then that's when I turned and I'm like this and I—that's when ….

"Q: But you didn't see (Scott) fall; you just hear him scream?

"A: No I didn't see—yeah, I didn't see (Scott) fall.

"Q: But you—you—you observed [defendant] pulling the trigger?

"A: Yeah, I guess because I seen it.

"Q: Okay. And he had a gun in each hand?

---

[3]Scott was the victim.

"A:     Yeah.  My own cousin."

Ronald also made a statement to Romiti on the evening of the day of the shooting. Ronald's statement was recorded and transcribed.[4]  Ronald said that when he came to the front of the mobile home, he found Scott arguing with defendant and Timothy.  Scott said he was ready to fight both of them.  Then Scott beat up defendant.  Timothy tried to come to defendant's aid, but Tamara interfered.  Defendant said, "'Okay.  You whopped my ass,'" but then he had a gun and began shooting at Scott.  According to Romiti, Ronald said he could "only see [defendant] from shoulders up, and the motions he was making [were] consistent with somebody firing a gun."  Ronald did not say he saw the gun in defendant's hands, but he was "a hundred percent sure" defendant was the shooter.

On March 22, 2012, four days after the shooting, defendant was taken into custody.  He told Sergeant Zachary Zamudio that he had ingested methamphetamine. Concerned about a possible overdose, Zamudio had defendant transported to a hospital. Zamudio and Detective Kristine Hawk interviewed defendant in the emergency room. The interview was recorded and transcribed, but because the recorder was in Zamudio's pocket part of the time and the emergency room was noisy, most of defendant's statements are unintelligible.

Defendant said he was fighting and got hit in the face.  Timothy separated him from Scott.  Defendant had a nine-millimeter gun.  Scott also had a gun.

Among the portions of the transcript in which defendant gives intelligible answers directly addressing the shooting, two are particularly significant.  The first reads as follows:

"Zamudio:    Do you know the other people that you hit?

"Defendant:   (Unintelligible.)

---

[4]Neither the recording nor the transcript is included in the appellate record.  The description in the text above is based on Romiti's testimony at trial.

4.

"Zamudio:    Were you aiming for the other ones?  (Unintelligible) cause there was (unintelligible.)

"Defendant:  The only person I shot at, that I had any animosity (unintelligible).

"Zamudio:    Cause there, cause there's more than him who got hit.

"Defendant:  He got shot dam [sic] near point blank.

"Zamudio:    I don't know about .…

"Hawk:        (Unintelligible.)

"Zamudio:    Three through and throughs.

"Hawk:        (Unintelligible.)

"Defendant:  Three through and through, right?  (Unintelligible) hospital."

This is the second:

"Zamudio:    And another got hit on the shoulder and then somebody else (unintelligible).  Did you happen to see what he did with the gun when— right after you shot him—did he reach for it, or .…

"Defendant:  He had it in his hand the whole time."

Timothy called the sheriff's department to make a statement on March 23, 2012, the day after defendant was taken into custody.  Timothy spoke to Zamudio.  The statement was recorded and transcribed.[5]  Timothy said he and defendant went to Roshena and Ronald's residence to talk with Scott about a missing gun.  Scott came to the door and told defendant to put the guns down and they would fight.  Scott and defendant fought, and Timothy tried to pull Scott off defendant.  Tamara grabbed Timothy.  Timothy went to the car and got a gun.  After the shooting, Timothy said to defendant,

---

[5]The recording and transcript are not included in the appellate record.  The description in the text above is based on Zamudio's trial testimony.

"'[W]hat the fuck did you do? What the fuck did you do? I didn't come down here for this shit.'" Defendant pointed the gun at Timothy and told him to get in the car.

The district attorney filed an information charging defendant with four counts: (1) attempted murder of Scott (Pen. Code, §§ 187, 664);[6] (2) assault on Ronald with a firearm (§ 245, subd. (a)(2)); (3) assault on Roshena with a firearm (*ibid.*); and (4) assault on Tamara with a firearm (*ibid.*). The information further alleged that defendant personally used and discharged a firearm (§§ 12022.5, 12022.53), caused great bodily injury (§ 12022.7, subd. (a)), had a prior strike conviction (§ 667, subds. (b)-(i)), and served a prior prison term (§ 667.5, subd. (b)).

Defendant made a motion in limine to exclude his statement to the officers. At the hearing on the motion, defendant argued that the officers obtained his statement by continuing to question him after he invoked his right to an attorney. He relied on this portion of the transcript:

"Zamudio:    Yeah. You said you were willing to talk to us.

"Defendant:  What you want to talk about?

"Zamudio:    What's that? You've [been] around. You know I've got to read [you] your Miranda rights. Do you understand your rights? Do you know what your rights are? Okay. I'm going to read them to you and after I ask you if you understand, say yes or no, okay? You have the right to remain silent, do you understand? What's that? I can't hear you.

"Defendant:  Yes.

"Zamudio:    Ok. Anything you say may be used against you in court, do you understand? Yes? You have the right to the presence of an attorney before and during any questioning, do you understand?

"Defendant:  Yes.

"Zamudio:    Yes. If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you want? Do you

---

[6]Subsequent statutory references are to the Penal Code unless otherwise noted.

6.

understand that? What's that? Do you have any questions on any of that? No? You have any idea why we want to talk to you?

"Defendant:   (Unintelligible.)

"Zamudio:   You sure? You sure? You don't have any idea? You sure?

"Defendant:   (Unintelligible.)

"Zamudio:   Did you get in a fight with anybody? What's that? Okay. Well it's kind of (unintelligible) and what happened. Ok. What's your— what's your side of what happened?

"Defendant:   (Unintelligible.) I'll tell that to my lawyer.

"Zamudio:   Ok."

The officers immediately went on to question defendant, eliciting the responses we have described.

At the hearing, Zamudio testified that, after defendant said "I'll tell that to my lawyer," he and Hawk did not ask him to explain what he meant or whether he was asking for a lawyer and instead simply proceeded with questioning. Further, defendant never said he did not want to talk to the officers and never said he wanted an attorney and said nothing on this topic that does not appear in the transcript.

The court denied the motion to exclude. It found that defendant's remark was not a clear invocation of his right to counsel.

At trial, Scott, Tamara, Ronald, Roshena, and Timothy all testified that they did not see or remember who did the shooting.

Scott testified that three males came to the door and there was a fight, but he could not remember who any of them were and did not know whether any of them were among the people in the courtroom. Scott did not want to testify and said, "I wish there was something I could do to get out of it." He also said, "I wish I could plead the Fifth," and that he was afraid for his family.

7.

Scott said he was unarmed and believed each of the three men had a gun. He fought one of the three men and won, and then fought another. Then he was shot. He believed the shooter was the first man he had fought with because the shooter's face was bleeding. He counted eight shots and knew he had been hit four times. He also knew which of the eight shots were the four that hit him.

Tamara testified that she was at the residence when Scott was shot but did not remember the shooting or anything else that happened because she was very drunk. At the time of the shooting, she was an alcoholic and drank all day, every day, causing her to "black out a lot …." That day, she had drunk three pints of vodka. She did not remember whether her cousins, defendant and Timothy, came to the house. She said, "[I]t was a big blur. I was—I don't—I do not remember. I do not recall. I cannot say—specifically say something or anything that happened, because I don't remember; I was really wasted." She guessed that she might also have been in shock.

Tamara recalled being taken somewhere by the deputies but did not remember giving them a statement. The recording of her statement had been played for her on the day she testified, and she said she was "shocked" to hear it. The prosecutor asked her point by point whether she had made each of the statements preserved in the recording, and Tamara answered each question by saying she did not remember making the statements. She said, "You can ask me as many questions like this if you want, because that's going to be the same answer. I don't remember the whole situation."

Tamara did not want to testify. She said she was upset because the last time she had to testify, she was five years old and testifying against her grandfather, who had raped her. Later, when asked whether she wanted to be testifying against defendant, Tamara said, "Of course not." Her recorded statement incriminating defendant was played for the jury.

Ronald testified that he came to the front of the mobile home after Tamara told him there was trouble there. Defendant, Timothy, Scott, Tamara, and Roshena were

8.

there, and another man was in the driveway near the street. Some neighbors were standing around watching. There had been a fight and defendant had blood on his face. Then Ronald heard three to five gunshots, and he ran toward the motor home in the back. The shots had different sounds, as if they were coming from more than one gun. Ronald saw that Scott had been hit but did not see him getting hit. The gunfire came from Ronald's right side. Timothy could not have been the shooter because he was on Ronald's other side. Ronald denied, however, that he saw defendant with the gun and said he did not know whether defendant was the shooter. He told officers that Scott had fought with defendant because he saw blood on defendant's face, but he did not actually see the fight, and he did not tell them he saw defendant with a gun or that defendant shot Scott. Timothy and the third man were not bleeding. Ronald listened to a recording of the interview in which he told Romiti he was sure defendant was the one who shot Scott, but he testified that he did not remember saying that and did not know who the shooter was.

Ronald said he was nervous about testifying and did not want to be there. He was asked about a conversation he had with Tamara in the hallway of the courthouse before she testified. He said she was upset, and he answered yes when asked, "Isn't it true that she specifically told you that she was simply going to get on the stand and say she didn't remember?" The jury heard Romiti's testimony that Ronald said he saw the shooting happen and was sure defendant was the shooter. The recording and transcript of Ronald's statement were not presented to the jury.

Roshena testified that she came to the front of the mobile home after Tamara shouted that defendant, Timothy, and Scott were fighting. Tamara was drunk, but Roshena was not aware that she had a drinking problem or that she had "periods of blackout" when drunk. In front of the residence, Roshena saw defendant, Timothy, Scott, Tamara, and some neighbors. Defendant and Scott were having a fistfight. No one had a gun and Roshena never saw any guns at any point. Defendant's face was bloody.

9.

Timothy tried to pull defendant away, and Tamara pushed Timothy. Roshena grabbed Tamara around the waist and pulled her away from the fray. As she headed back toward the motor home holding Tamara, she heard shots and continued running. She did not see who was firing a gun and did not see anyone getting hit by bullets. She was not paying attention to defendant or Timothy in the moments just before she heard the shots.

Roshena laid Tamara down inside the motor home. Roshena had bumped Tamara's ankle on a cement step while carrying her, and Tamara was saying it hurt. Then Roshena went back to the front. Everyone was gone except for some neighbors, who were still standing in the road, and Scott, who was lying on the porch, wounded.

When asked how she felt about having to testify, Roshena said, "I'm not happy about it. Nervous wreck, actually." Roshena had been interviewed at the sheriff's department, but no evidence of her statement was presented at trial.

Timothy testified that he drove defendant to Roshena and Ronald's residence. He was "tweaked out," i.e., high on methamphetamine, at the time and did not remember why they went there. He remembered little about the incident. He claimed that his memory about things in general was impeded by a traumatic event that had taken place since the shooting: "I don't remember a lot since my daughter died, and she died in my arms at 17 years old. I don't remember a lot of shit that happened before that."

Timothy did not recall anyone else being in the car with them, but another car went with them. Two or three people were in the other car, one of whom was named James. Timothy did not know whether or not defendant had a gun.

Timothy knocked on the door and a man holding a gun answered. Timothy and the man were engaged in "just general conversation" when "[a] fight broke out …." The fight broke out because the man with the gun made "little snide comments" to defendant. Defendant made snide comments in return, and the man who answered the door hit defendant with either his hand or his gun. Timothy tried to break up the fight. Tamara pulled him away. At some point, the fight ended. Defendant's face was bleeding. Then

10.

Timothy heard gunfire. He did not see anyone get hit. He did not see defendant fire a gun, and he did not fire a gun himself. He asked defendant what happened, but defendant did not answer, except to tell Timothy to get in the car. Then Timothy and defendant left in the car. Timothy did not remember whether defendant was holding a gun at that point. When asked how he felt about testifying against his brother, Timothy said he was subpoenaed and had to be there.

Timothy remembered calling Zamudio to give a statement but did not "remember the whole conversation …." He listened to the recording of the statement before he testified, but did not remember making many of the statements on the recording. He did not remember saying he and defendant went to the residence to confront Scott about a missing gun. He did not remember saying defendant had a gun and pointed it at him when they were getting back in the car. He did not recall telling Zamudio that he asked defendant, "'[W]hat the fuck did you do?'" or that he told defendant, "'I didn't come down for this shit, man.'" The jury heard Zamudio's testimony that Timothy did say these things. The recording and transcript of Timothy's statement to Zamudio were not presented to the jury.

Defendant called no witnesses. The jury found him guilty as charged and found true the firearm and great-bodily-injury allegations. It also found that the attempted murder was committed willfully, deliberately, and with premeditation. Defendant admitted he had a prior strike conviction and a prior prison term. The court imposed a total indeterminate sentence of 39 years to life on count 1 and a total determinate sentence of 35 years 8 months on counts 2 through 4.

## DISCUSSION

### I.    Miranda

Defendant argues that he clearly invoked his right to counsel when he initially responded to police questioning by saying, "I'll tell that to my lawyer." He says this required that his statement be excluded, and the trial court erred in concluding otherwise.

11.

In reviewing a trial court's disposition of a claim that a statement should have been excluded because it was obtained in violation of *Miranda*, we accept the trial court's findings on any disputed matters of fact if supported by substantial evidence, and we review de novo the legal issue of whether the undisputed facts and the facts found by the trial court and supported by substantial evidence show that the challenged statement was legally obtained. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.) There is no dispute here about the words of defendant upon which the alleged invocation of the right to counsel is based, or about the circumstances under which those words were spoken, so we are left only with the legal question of whether these facts show that defendant's statement was admissible.

*Miranda*, of course, held that before conducting a custodial interrogation, police must explain to a suspect his or her right to remain silent, to have the assistance of counsel, and to have counsel present during questioning. (*Miranda, supra*, 384 U.S. at pp. 469-473.) In *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 (*Edwards*), the Supreme Court added that, when the suspect invokes the right to have counsel present during questioning, officers must cease questioning until a lawyer has been provided or the suspect reinitiates questioning. Finally, in *Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*), the court specified that, to trigger the cessation of questioning required by *Edwards*, the suspect must "unambiguously request counsel." The question presented in this case is whether defendant's remark, "I'll tell that to my lawyer," was an unambiguous request for counsel.

At first glance, it might appear that defendant has common sense on his side. Immediately after reading defendant his rights, Zamudio asked him for his side of the story, and defendant said he would tell it to his lawyer. In his opening brief, defendant asks rhetorically, "Isn't this a clear indication that [defendant] does not want to talk to Zamudio, but instead wants to talk to a lawyer? What is ambiguous about this

12.

invocation?"  It seems fair to assume that the officer could have guessed that defendant was invoking his rights or at least could have asked defendant if that was his intention.

A careful reading of *Davis*, however, shows that the United States Supreme Court believes the Constitution does not require exclusion of confessions on *Edwards* grounds just because an officer could hazard a reasonable guess that a suspect's remarks mean he has a present desire for advice of counsel and wishes not to say more without it, or because an officer could easily clear up any ambiguity by asking a follow-up question.

The court began its analysis in *Davis* by pointing out that the doctrine of *Miranda* itself is not required by the Constitution, but is instead a protective measure to ensure preservation of underlying rights.  (*Davis, supra*, 512 U.S. at pp. 456-457.)  The *Edwards* requirement to stop questioning when a suspect invokes his or her rights, likewise, is not constitutionally mandated, but is a "'second layer of prophylaxis'" created by the court. (*Davis, supra,* at p. 458.)  In the court's view, it would have been decreeing an expansion of an already extensive court-created system of nonmandated protections were it to "require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." (*Id.* at p. 459.)  A similar expansion would have been involved in creating a requirement that if a suspect makes an ambiguous reference to an attorney, interrogators must ask clarifying questions.  (*Id.* at pp. 461-462.) The court concluded that it was "unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer." (*Id.* at p. 462.)

The court was realistic about the potential of its decision to burden some speakers. "We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present." (*Davis, supra*, 512 U.S. at p. 460.)  But the court was unmoved by this fact:  "[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." (*Ibid.*)

13.

A concurring opinion argued that when a suspect makes a comment that could be a request for counsel, interrogators should be required to ask for clarification before continuing. (*Davis, supra*, 512 U.S. at p. 466 (conc. opn. of Souter, J.).) This is what actually happened with the defendant in *Davis*, and the defendant told the interrogators he was not asking for a lawyer. (*Ibid.*) The concurring justices believed that "fairness and practicality" supported this approach. (*Id.* at p. 467.)

The majority did not agree. In its view, the ambiguity of the defendant's initial remark—"'Maybe I should talk to a lawyer'"—meant the officers were entitled to ignore it. (*Davis, supra*, 512 U.S. at pp. 455, 462.)

It appears to us that the point of *Davis* is to avoid the drastic sanction of excluding a defendant's confession from evidence in cases where any degree of speculation about whether the defendant was invoking his rights is involved. It is up to the defendant to be clear and direct and not to use oblique language.

In light of the reasoning of *Davis*, we cannot say defendant's remark—"I'll tell that to my lawyer"—was a clear and unambiguous request for an attorney. A reasonable hearer could be uncertain whether defendant was asking to see an attorney at that time and declaring an unwillingness to talk without one, or was instead only expressing his intention of consulting with an attorney at some point. It follows that the officers were not required to cease questioning defendant, and exclusion of his incriminating statement was not required.

## II. *Leading questions*

The prosecutor asked Tamara a series of leading questions closely tracking her statements in the recorded interview. Defense counsel was granted a continuing objection to these questions.[7] Tamara answered all of them by saying she had no memory of her

---

[7]The continuing objection came near the end of the questioning, but we will assume for the sake of argument that the issue has been preserved for appeal.

statements and no memory of the events to which the statements referred. Defendant now argues that the questions were improper. He further argues that, although the questions elicited no incriminating testimony, they were prejudicial because they "essentially stat[ed] the prosecutor's theory of the case …."

We review this issue for abuse of discretion. (*People v. Cox* (1991) 53 Cal.3d 618, 700 [trial court has inherent discretion, as well as statutory discretion under § 1044, to control proceedings to ensure efficacious administration of justice], overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; *People v. Chenault* (2014) 227 Cal.App.4th 1503, 1514 [trial court has broad discretion under Evid. Code, § 765, to exercise control over examination of witnesses].) Defendant says we should instead apply the de novo standard of review because "arguably" a pure question of law or a mixed question of law and fact is involved, but we do not see how anything other than an ordinary question of the court's regulation of the proceedings is at issue.

As discussed in part III of this opinion, below, Tamara's denials of the ability to recall were implicitly inconsistent with her recorded statements. The trial court had discretion to allow leading questions to lay a foundation for the admission of prior inconsistent statements. (*People v. Collins* (2010) 49 Cal.4th 175, 215.) It did not abuse its discretion in allowing this here.

Further, "[l]eading questions are permitted on direct examination 'to the extent necessary to stimulate or revive [the witness's] recollection.'" (*People v. Collins, supra,* 49 Cal.4th at p. 215.) Defendant argues that there was no justification for continuing to ask leading questions after Tamara first stated that she had no recollection at all, but we do not agree. Tamara's claim of a total lack of recollection contrasted so sharply with her earlier detailed statement that the court was justified in allowing the prosecutor's insistent efforts to press for some opening in her wall of denials.

Finally, any error was harmless. Defendant's only theory of prejudice from the leading questions is that they gave the prosecutor an opportunity to state his theory of the

case. There was no shortage of other opportunities for the prosecutor to do this, however. There is no reasonable probability that the jury would have reached a different verdict if it had not heard these questions. To the extent that defendant's theory of prejudice could also be that the prosecutor was enabled to tell the jury the substance of Tamara's recorded statements, and that those statements were inadmissible hearsay, we hold that the statements were admissible, as discussed in part III below.

## III.  *Prior inconsistent statements*

Defendant argues that Tamara's recorded interview was inadmissible hearsay. The People maintain that it was admissible under the hearsay exception for prior inconsistent statements. (Evid. Code, §§ 770, 1235.) Defendant avers that, as mere denials of recollection, Tamara's testimony was not inconsistent with her statements in the interview, so the exception did not apply.

As a threshold matter, defendant never objected to the admission of Tamara's police interview, so the issue is forfeited on appeal. (*People v. Saunders* (1993) 5 Cal.4th 580, 590; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1.) As we will explain, defendant's argument would be without merit even if it were not forfeited.

Evidence Code section 1235 provides that a prior statement is not made inadmissible by the hearsay rule if it is inconsistent with the speaker's testimony in court and is offered in compliance with Evidence Code section 770. Evidence Code section 770 provides that a prior inconsistent hearsay statement is admissible only if the witness has been given an opportunity to explain or deny the statement or has not been excused from testifying further.

Our Supreme Court has held that a witness's testimony that he or she does not remember an event is "[n]ormally" not inconsistent with a prior statement describing the event. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.) There is an implied inconsistency, however, if the claimed lack of memory is a "deliberate evasion." (*Ibid.*)

"As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." (*Ibid.*)

Tamara's recorded interview would, of course, be inadmissible under the hearsay rule unless there is an applicable exception. She had ample opportunity to explain or deny her statements in the interview, so the only question, as far as the prior-inconsistent-statement exception is concerned, is whether her claimed lack of memory was untrue. We conclude there is a reasonable basis in the record for finding it was. Tamara's prior statements were detailed and precise, while her testimony at trial was a complete blank. Her claimed lack of memory extended not only to witnessing the shooting, but also to giving her statement to the officers. She admitted in court that she had a general aversion to testifying and a specific disinclination to testify against defendant. Her testimony was part of a pattern in which all the eyewitnesses claimed not to know who fired the gun and, in so claiming, either conceded a disinclination to testify against defendant, or disavowed prior statements, or both. Tamara attributed her lack of memory to a drinking problem that caused her to black out, but her mother was not aware that Tamara, though drunk that day, had a drinking problem. There is a reasonable basis for concluding that Tamara was deliberately evading the questions the prosecutor asked.

## IV.    *Confrontation clause*

Defendant argues that the admission of Tamara's police interview also violated his rights under the confrontation clause of the Sixth Amendment.

Defendant relies on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). *Crawford* held that admission of hearsay that is testimonial in character violates the confrontation clause even if it is admissible under state evidence rules, unless the declarant either is subject to cross-examination at trial or is unavailable for trial and there was a prior opportunity for cross-examination. (*Id.* at pp. 36, 59 & fn. 9; 61-62, 68.) Statements elicited during police interrogations are testimonial. (*Id.* at p. 52.)

17.

Tamara testified at trial, and defense counsel cross-examined her. Defendant argues, however, that Tamara was not genuinely subject to cross-examination because she did not remember making the hearsay statements or witnessing the underlying events and therefore could neither explain nor deny what she said. For this reason, defendant maintains, admission of the police interview violated the confrontation clause. He claims the lack of genuine cross-examination also prevented him from presenting his defense and therefore denied him due process of law.

As we have mentioned, defendant did not object to the admission of Tamara's recorded interview, so the issue is forfeited on appeal. Further, defendant's argument is without merit, as we will explain.

Defendant cites no authority for the view that, for purposes of *Crawford* and due process, a witness's claimed inability to recall events and prior statements about them means cross-examination of the witness is not genuine. *Crawford* is not based on any policy that would support shielding a defendant from available witnesses' prior statements any time those witnesses claim not to remember what they witnessed or said. The *Crawford* opinion is instead based on a historical practice of excluding testimonial hearsay except when cross-examination is possible. (*Crawford, supra,* 541 U.S. at pp. 42-56.) Defendant cites nothing in *Crawford* or elsewhere suggesting that this historical practice included a general rejection of the adequacy of cross-examination of allegedly forgetful witnesses.

As there is nothing in Justice Scalia's majority opinion in *Crawford* to the contrary, the issue is controlled by Justice Scalia's earlier majority opinion in *United States v. Owens* (1988) 484 U.S. 554 (*Owens*). *Owens* involved a witness who identified the defendant to the police as the person who beat him with a metal pipe and then, before trial, lost his memory of the attack as a result of his injuries. (*Id.* at pp. 555-556.) The Supreme Court rejected the defendant's argument that, although the witness was cross-examined at trial, the witness's forgetfulness denied the defendant his right of

18.

confrontation and made erroneous the admission of evidence of the identification: "'[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."'" (*Id*. at p. 559.)  The presence of the witness at trial for cross-examination is enough:  "It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even … the very fact that he has a bad memory." (*Ibid*.)  These means of impugning the prior statement "will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." (*Id.* at p. 560.)  Under *Owens*, the cross-examination of Tamara available to the defense was adequate for confrontation-clause purposes.

The Court of Appeal anticipated *Owens* in *People v. O'Quinn* (1980) 109 Cal.App.3d 219, 225-226, and followed *Owens* in *People v. Perez* (2000) 82 Cal.App.4th 760, 764-765.  Both cases rejected the defendants' argument that a witness's claimed forgetfulness vitiated cross-examination of the witness and rendered a prior inconsistent statement inadmissible.  Defendant maintains that these cases are distinguishable because in *Perez* there was evidence that the witness decided to lie to avoid retribution, and in *O'Quinn* the trial court made a finding that the witness was deliberately evasive; there were no such facts or findings about Tamara.  This distinction, however, does not affect the confrontation-clause analysis.  In *Owens* the witness lost his memory because of a head injury.  There is no mention in the opinion of any suggestion that he was faking. The court certainly did not hold that the confrontation clause allows admission of forgetful witnesses' prior inconsistent statements only if the forgetfulness is feigned.

Defendant cites *Davis v. Alaska* (1974) 415 U.S. 308 and *Douglas v. Alabama* (1965) 380 U.S. 415, but neither case involves a forgetful witness.  In *Davis v. Alaska*, the confidentiality of juvenile proceedings prevented a witness from being impeached by his juvenile probationary status on cross-examination.  In *Douglas*, the witness could not

19.

be cross-examined because he invoked his right against self-incrimination after being questioned in detail about a confession in which he inculpated the defendant. In both cases, the Supreme Court held that the defendants were denied the right of confrontation because the witnesses could not actually be cross-examined on matters of importance to the defense. (*Davis v. Alaska, supra*, at pp. 315-318; *Douglas, supra*, at pp. 419-420.) These cases are inapplicable to the forgetful-witness situation, in which the witness is actually cross-examined on the pertinent matters, and which is covered by the Supreme Court's later decision in *Owens*.

## *DISPOSITION*

The judgment is affirmed.

_____
Oliver, J.*

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Poochigian, J.

---

*Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.