J-S12043-20

2020 PA Super 127

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
SHERON JALEN PURNELL :
:
Appellant : No. 1646 EDA 2019

Appeal from the Judgment of Sentence Entered March 18, 2019
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0004353-2016

BEFORE:  SHOGAN, J., McCAFFERY, J., and COLINS, J.[*]

OPINION BY COLINS, J.:                          **FILED MAY 28, 2020**

Appellant, Sheron Jalen Purnell, appeals from the aggregate judgment of sentence of 20½ to 47 years of confinement, which was imposed after his jury trial convictions for murder of the third degree and firearms not to be carried without a license.[1]  We affirm.

The facts underlying this appeal are as follows.  On the evening of October 3, 2016, in the area of Belmont Street and Sixth Avenue in Coatesville, Kevin Jalbert was shot seven times and killed.  N.T., 11/29/2018, at 107.  At the time of the shooting, Stacie Dausi, Justin Griest,[2] and Sharon

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c) and 6106(a)(1), respectively.

[2] This witness's name is spelled as either "Greist" or "Griest" throughout various court documents.  However, at the beginning of his trial testimony,

and Robert Swisher were inside the Swishers' residence on Belmont Street and saw a group of black males in an adjacent alley and heard their voices grow louder and angrier. N.T., 11/26/2018, at 117 (Ms. Swisher), 146 (Mr. Swisher); N.T. 11/27/2018, at 70 (Griest); N.T., 11/28/2018, at 31, 35 (Dausi). Griest and Mr. Swisher witnessed the murder and identified Appellant as the shooter, although Griest later recanted after he was assaulted on September 2, 2018. Exhibits C10-G1 to C10-G6, C10-I; N.T., 11/26/2018, at 140-45; N.T., 11/27/2018, at 56-57, 88-89, 93-95, 97, 104-06, 119-123, 131; N.T., 11/28/2018, at 110-11; Trial Court Opinion, dated August 23, 2019, at 1, 8, 10-11 (not paginated).

Jalbert's murder and Griest's assault were also witnessed by A.H., an autistic minor. N.T., 11/28/2018, at 110-11; Trial Court Opinion, dated August 23, 2019, at 10-11. Prior to trial, the Commonwealth filed a motion asking the trial court to allow A.H. to have a "comfort dog" with her on the stand. The motion explained: "The comfort dog would enter the courtroom prior to the jury's entrance. The comfort dog would exit the courtroom once all the jurors are excused from the courtroom. The comfort dog would remain in the witness stand outside the presence of the jury." Commonwealth's Motion for Special Procedures During the Presentation of the Testimony of

---

when asked to spell his name, he answered, "G-r-i-e-s-t." N.T., 11/27/2018, at 32. Accordingly, we have used that spelling throughout and have corrected it in quotations where it was misspelled without further annotation.

Child Witnesses, at 1-2 ¶ 4; *see also* N.T., 11/19/2019, at 50 (Commonwealth suggests same procedure).

During a pretrial hearing on the motion, Appellant objected to the dog's presence in the court, expressing his concern that "the jury is going to see the dog somehow and they're going to feel sympathy for [A.H.]" N.T., 11/19/2018, at 50. The trial court asked the Commonwealth why it was requesting a comfort dog for A.H. alone, when there were other minor witnesses in the case, and the Commonwealth answered: "A.H. has expressed to law enforcement that she is concerned about her safety coming to court and it's for that reason the Commonwealth is asking for the dog to accompany her to the stand." *Id.* at 53. The trial court granted the Commonwealth's motion. Without withdrawing his objection to the dog's attendance, Appellant further argued that, if the trial court was going to allow the dog in the courtroom, the dog should be "out of the view of the jurors." *Id.* at 55.

At trial, on November 26, 2018, the Commonwealth presented the testimony of Corporal Shawn Dowds of the City of Coatesville Police Department.

> Corporal Dowds gave extensive testimony on Coatesville's system of surveillance cameras, including over fifty exhibits in the form of videos and still images from those cameras. While discussing the background of the surveillance cameras, Dowds mentioned that the system is very useful because police in Coatesville "don't have a lot of cooperation in the community in the city. It's, you know, people don't want to talk to the police as much as what we may find other places, I'm not sure if this is the only place that's worse." N.T., 11/26/18, p. 165. As the prosecution probed that testimony further, an objection was raised by defense counsel:

Q. [By the Assistant District Attorney] Corporal, you said something interesting I wanted to follow up with the jury, you said that people aren't often willing to come forward or something to that effect. Does that have anything to do with what's known as the snitch culture?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Grounds? In a word or two, what's the basis for your objection?

[DEFENSE COUNSEL]: I think it's inappropriate, Your Honor. It's a broad generalization and -

THE COURT: Well, sustained as to the form of the question. It seemed a little pointed to a particular answer but I'll let you lay the foundation and the general subject matter is relevant.

N.T. 11/26/18, pp. 165-66. . . . Corporal Dowds then testified that the video cameras are useful to identify potential witnesses that are reluctant to be seen speaking to the police, which precipitated another objection:

... And with these video cameras, like I previously said, it kind of helps us like identify these people who were around the area at the time, so we can contact them later, have them speak to us at a later date in a different location, and I believe a lot of it is, you know, they're something big happened here, something awful happened here, they don't want to be a part of it. They don't want to be seen talking to police about it. They don't want to be threatened, harassed.

[DEFENSE COUNSEL]: Objection, Your Honor. This is going too far.

[THE COMMONWEALTH]: This is entirely within Your Honor's ruling, Judge.

THE COURT: Well, to the extent that he can quantify how many times, for example, he has seen this type of situation, that might minimize the objection that [Appellant] has.

[THE COMMONWEALTH]: That is actually my next question, Judge. I was waiting for the Corporal to finish his answer.

- 4 -

THE COURT: Objection overruled, but let's get some groundwork laid for his further testimony.

N.T., 11/26/18, p. 167. . . . [T]he testimony continued:

Corporal, you personally, you said that you worked patrol, now you work CID, you said you were on the scene initially, have you had to make contact with people on the street before?

A. You try.

Q. What happens when you try?

A. They tend to say I didn't see anything or they'll walk away. Some people may say talk to me later, not here, not now.

Q. Why do they say talk to me later, not here, not now?

[DEFENSE COUNSEL]: Objection. Calls for speculation.

THE COURT: Yeah, not why do they, but specific instances, if he has it, in the past I think would be a predicate to my permitting it to continue down this line.

N.T., 11/26/18, p. 168. . .

Q. Can you think of specific instances, you don't have to say the case name, but can you think of specific instances where someone on the scene has said I won't talk to you here, I'll only talk to you somewhere else?

A. Absolutely.

Q. And can you think of specific instances, you don't have to mention case names, where someone has said I won't - I don't want to talk to you?

[DEFENSE COUNSEL]: Objection, Your Honor. I don't know what the relevance of this is. It's not this case.

THE COURT: Well, is this all background as to why they have surveillance, why they beefed up their surveillance cameras?

[THE COMMONWEALTH]: That is part of it, Judge, yes, and, in fact, in this case - can we go to side bar?

> THE COURT:   We can, but I think I'm about to overrule [Appellant]'s objection.
>
> [THE COMMONWEALTH]:   Then I'll stay here.
>
> THE COURT:   But again, try to be - I think you're trying to be, and I don't know if your question was objected to midway though it or a third of the way through it.  But let's do it this way:  Repeat your question and be careful as you phrase it and see what that produces from the defense side.  I don't want to generalize and have the jury apply generally some general statements as to the particulars in this case.  That's [Appellant]'s objection as I understand it.
>
> [DEFENSE COUNSEL]:      That is my objection.
>
> THE COURT:   Okay.  So let's avoid that.

N.T., 11/26/18, pp. 169-170. . . . Corporal Dowds's testimony on this matter concluded as follows:

> Q. Have there been instances where witnesses have said I was not present when the cameras clearly show they were?
>
> A. Yes.
>
> Q. Can you cite - or not have to cite, but have you seen that in numerous other cases?
>
> A. Yes.
>
> Q. When you approach witnesses with camera footage of them at a scene, is it easier to have them make statements at that time?
>
> A. Many times, yes.
>
> Q. Can you also use camera footage to corroborate what witnesses tell you that they witnessed?
>
> A. Absolutely.

N.T., 11/26/18, p. 170.   Corporal Dowds then moved to the precise location and method of operation of certain cameras that captured the events of this case, followed by the introduction of what those cameras captured on the day of the murder.

Trial Court Opinion, dated August 23, 2019, at 12-15.

On November 27, 2018, an issue also arose concerning Griest's testimony:

> Griest was an eyewitness to this murder who made clear, multiple times, his unwillingness to cooperate with the Commonwealth. . . . [T]he Commonwealth alleged at trial that Mr. Griest was the victim of witness intimidation when he was assaulted on September 2, 2018.[3] At the time of trial, Mr. Griest was being held in Chester County Prison on a material witness warrant issued by the court to ensure he would appear to testify. During Mr. Griest's testimony, the following exchange took place:
>
> Q. No. Just a minute ago you testified to the jury that you saw it?
>
> A. I don't . . .
>
> Q. This is the problem of lying, isn't it, Justin -
>
> A. I don't know what-
>
> Q. - it's hard -
>
> [DEFENSE COUNSEL]: Objection.
>
> THE WITNESS: Listen, you coming at me all the time -
>
> THE COURT: Hold it. Hold it, everybody, except for me. Your objection, [Defense Counsel]?
>
> [DEFENSE COUNSEL]: He's already amended it. He's accusing the witness of lying.
>
> [THE COMMONWEALTH]: I am.
>
> [DEFENSE COUNSEL]: It's not a question.
>
> [THE COMMONWEALTH]: I can rephrase it, Judge.

---

[3] "Indeed, one of the perpetrators of the assault, Santanna McMillan, entered a guilty plea on April 15, 2019 to Intimidation of Witnesses or Victims, 18 Pa.C.S. §4952(a)(l). *See Commonwealth v. Santanna McMillan,* [Docket Number] CP-15-CR-[0000]3268-[20]18." Trial Court Opinion, dated August 23, 2019, at 7-8.

> THE COURT: Yeah, I think credibility determinations are for the jury to make. Let's come to side bar with the court reporter, please.
>
> (Whereupon, at this time, there was a sidebar discussion held on the record, as follows:)
>
> [DEFENSE COUNSEL]: If you could sustain my objection on the record.
>
> THE COURT: What was your objection?
>
> [DEFENSE COUNSEL]: My objection as that it's argumentative and the Commonwealth is accusing the witness of being a liar.
>
> THE COURT: Yes, I'm pretty sure that it wasn't counsel's determination to make of whether they were lying. That's for the jury. The record is clear on that.
>
> [end of side bar discussion]
>
> N.T., 11/27/18, pp. 79-80, 82.

*Id.* at 1-3.

> Mr. Griest . . . testified that he had been attacked by a group of males on September 2, 2018. Photographs of Mr. Griest's injuries were introduced as Exhibits C10-G1 through C10-G6. The court did not permit the Commonwealth to play a video of the assault due to its potential inflammatory effect, but the court did permit the admission of the transcript of that video as Exhibit C10-I. Although Mr. Griest denied that the assault was connected to the instant case, the transcript indicated that the assailants were shouting "free Ryda," which is the nickname of [Appellant]. . . . Mr. Griest testified that his attackers took a scooter specifically from A.H. and used it to beat him.

*Id.* at 8.

On November 28, 2018, A.H. testified. A.H. and the comfort dog entered and took their position on the witness stand before the jury was brought into the courtroom. N.T., 11/28/2018, at 63; Trial Court Opinion, dated August 23, 2019, at 6-7.

- 8 -

[D]uring cross-examination, A.H. was overcome with emotion and temporarily unable to continue her testimony, and the court took a recess in order for A.H. to collect herself. During that recess, the court and counsel conducted an extensive sidebar discussion about A.H.'s further testimony. *See* N.T., 11/28/18, pp. 99-106. The sidebar conference opened with the Commonwealth asking permission to raise on redirect examination the issue of whether A.H. had been subjected to witness intimidation, including her presence during the assault on Mr. Griest. The court granted that request, making the following comment:

> THE COURT: The cat is out of the bag. She is still sobbing uncontrollably on the witness stand after about three minutes. I think the less time, frankly, both sides [spend] with this [witness] I think the better off both cases are going to be.

N.T., 11/28/18, p. 99. The Commonwealth initially desired to ask A.H. if she had ever been "intimidated" or "threatened," but the court did not permit those open-ended questions based upon A.H.'s unstable and emotional demeanor on the stand:

> THE COURT: All right. I'm going to permit the Commonwealth, given the state of the witness who appears now after about four minutes to have stopped crying, to lead her. Just lead her. I am going to let you lead. [Defense counsel] can lead her anyway, you got her on cross-examination. But in terms of specific questions about dates of intimidation, we'll see what her answers are as opposed to open-ended. The question were you intimidated, it's going to take, I think, that's my assessment having listened to her carefully now for probably close to an hour, you're not likely to get anything other than an additional emotional response from her and for that basis with a general open-ended question, for that reason and also because of her age . . ., the level of emotion that she has shown for the past hour in the courtroom, there will be some evidence that she's somewhere on the autism spectrum at some point, and for those reasons I am going to permit the Commonwealth to lead her because I think we'll get through it more quickly.

N.T., 11/28/18, pp. 101-102. After the conclusion of cross-examination, the Commonwealth's redirect examination solely focused on the assault of Justin Griest: . . .

Q. Yes, Your Honor. [A.H.], earlier you told us that you were playing on a Razor scooter on the day that this shooting happened. Did you tell us that?

A. Yes.

Q. A few months ago was your Razor scooter taken by a group of men?

A. No.

Q. Do you remember somebody taking your Razor scooter?

A. Yes, but that wasn't - that wasn't the shooting. That was something else.

Q. It was a different day than the shooting?

A. Yes.

Q. Can you talk into the microphone? On that different day, was there a person with you?

A. Yes.

Q. What's that person's name?

A. It was my mom.

Q. Your mom, and was there another person with you that day when the scooter was taken?

A. Yes.

Q. What was that person's name?

A. Justin.

Q. Did you witness any injuries on Justin that day?

A. Yes.

Q. Can you tell the jury what the injuries on Justin were?

A. He had a messed-up eye because he came in my house. Well, he knocked on the door, and came in the house, and told us to call the cops - well, call 9-1-1, and he had a messed-up eye. His lip was all swollen. He had - his shirt was ripped, and he had scratches on his back. I don't know what it was from. And he told us that -

> [DEFENSE COUNSEL]:     Objection.  It would be hearsay, Your Honor.
>
> THE COURT:   I am going to enforce that one.  I'm not going to let you say what he said to you.  Not that he didn't say it, but I'm not going to let you say it now.  Go ahead, [Commonwealth].
>
> [THE COMMONWEALTH]: I have nothing further for this witness. . . .

N.T., 11/28/18, pp. 110-111.  These questions constituted the entirety of A.H.'s testimony about the attack[.]

*Id.* at 8-11.  At the end of A.H.'s testimony, she and the comfort dog exited the courtroom after the jury was removed.

Appellant was found guilty of the aforementioned charges on November 30, 2018, and was sentenced on March 18, 2019.  Following the denial of his post-sentence motions, Appellant filed this timely direct appeal on June 6, 2019.[4]

Appellant presents the following issues for our review:

> I.     Did the trial court err in failing to rule on defense objection and failing to instruct the jury accordingly with regard to Commonwealth accusing witness, Justin Griest, of being a liar during direct examination?  N.T. 11/27/18, pp.79-80, 82.
>
> II.     Did the trial court err in permitting a dog in the courtroom for the purpose of providing comfort to testifying witness, A.H.?  N.T. 11/19/18, pp. 49-55; N.T. 11/28/18, pp.4-9.
>
> III.     Did the trial court err in allowing the Commonwealth to inquire of A.H. regarding the assault of Justin Griest which took place on September 2, 2018?  The Commonwealth pursued this line of questioning pursuant to the defense eliciting an inconsistent statement given by A.H. to defense investigator.  The

---

[4] Appellant filed his statement of errors complained of on appeal on July 29, 2019.  The trial court entered its opinion on August 23, 2019.

statement given to defense investigator on June 25, 2018, however, predated the evidence of intimidation the Commonwealth introduced. This additional testimony regarding the assault on Mr. Griest was inflammatory and unfairly prejudicial to Appellant in that there was no evidence that Appellant directed these criminal acts. In addition, there was no evidence that A.H. changed her story as a result of the September 2, 2018 assault since the statement given to defense investigator was given on June 25, 2018. N.T. 11/28/18, pp.102-105.

IV. Did the trial court err in repeatedly allowing testimony regarding Coatesville residents' general reluctance to provide information to police in criminal investigations in that this line of questioning was not specific to this case? N.T. 11/26/18, pp.167-170.

Appellant's Brief at 5.

## Testimony of Justin Griest

Appellant first contends that "the trial court erred in failing to rule on [a] defense objection and failing to instruct the jury accordingly with regard to Commonwealth accusing witness, Justin Griest, of being a liar during direct examination." *Id.* at 14.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable David F. Bortner, we conclude this issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of that question:

Defense counsel's initial objection was general ("Objection."), followed by defense counsel's statement that the Commonwealth was "accusing the witness of lying." The [trial] court acknowledges that there was no explicit ruling on that objection, either immediately upon it being raised and heard by the jury, or after the grounds were later clarified, out of the hearing of the jury, to "argumentative." However, the objection was *de facto* sustained by the court's comment, within the jury's hearing, that "credibility determinations are for the jury to make." That

- 12 -

comment constituted an immediate *sua sponte* curative instruction, emphasizing to the jury that it was their function, not the prosecutor's, to determine whether Mr. Griest was lying. In this context, the mere fact that the court did not explicitly state "objection sustained" does not affect the curative result.

[Appellant] also makes the claim that the court not only failed to rule on the objection, but also erred by "failing to instruct the jury accordingly[.]" This argument is belied by the fact that the court did so instruct - on its own immediate volition, without any request from counsel - and neutralized a potential prejudicial effect from the Commonwealth's statement. Moreover, Mr. Griest was not ultimately required to provide any answer to the question to which the defense had objected. The sidebar discussion . . . was primarily a discussion of the Commonwealth's desire to play Mr. Griest's video and audio recorded statement to police, which was published to the jury immediately following the sidebar conference. The Commonwealth's statement about Mr. Griest's "lying," and the defense objection thereto, were not subsequently revisited. For those reasons, the court did not err by failing to explicitly sustain the objection, especially when the court's *sua sponte* comment had the effect of a limiting instruction to cure any possible prejudice.

Trial Court Opinion, dated August 23, 2019, at 3-4.[5]

---

[5] In its brief to this Court, the Commonwealth alleges –

even if this Court finds that the trial court erred in not responding to the objection or not properly instructing the jury, the error was harmless. The evidence of [Appellant]'s guilt was so overwhelming, and the 'lying' insinuation was so brief, that it did not impact the outcome of [Appellant]'s trial.

Commonwealth's Brief at 11. We agree. All of Griest's recanted statements were corroborated by or repetitive of testimony from Dausi and Mr. and Ms. Swisher. **Compare** N.T., 11/27/2018, at 56-57, 70, 88-89, 93-95, 97, 104-06, 131 (Griest), **with** N.T., 11/26/2018, at 117 (Ms. Swisher), 140-46 (Mr. Swisher), **and** N.T., 11/28/2018, at 31, 35 (Dausi).

## Comfort Dog

Appellant next argues that the trial court erred in allowing a comfort dog to accompany A.H. while she testified, because: (1) the dog's presence generated sympathy in the jury, which prejudiced his defense; and (2) the Commonwealth failed to establish its necessity.[6] Appellant's Brief at 22, 29-

---

[6] Appellant additionally complains that "[t]here was no evidence that the dog used in this case was trained or certified to be a therapy / comfort dog by a recognized organization." Appellant's Brief at 33.

However, Appellant never raised this objection before the trial court, *see* N.T., 11/19/2018, at 49-55, and this claim is therefore waived. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Assuming that Appellant had preserved this challenge, we would note that Appellant's brief relies upon definitions of "service animals" or "service dogs" from federal and California statutes and from a federal court case. Appellant's Brief at 32-33 (citing 28 C.F.R. § 36.104 ("Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability."); CAL. CIVIL CODE § 54.1(b)(6)(C)(iii) (defining a "service dog" as a "dog individually trained to the requirements of the individual with a disability, including, but not limited to, minimal protection work, rescue work, pulling a wheelchair, or fetching dropped items"); *Baugher v. City of Ellensburg*, No. CV-06-3026-RHW, slip op. at 10-11 (E.D. Wash. filed March 19, 2007) (definition of service animal turns upon whether the animal is trained to do specific work or perform specific tasks)). Not only is none of this law precedential in Pennsylvania, but Appellant is conflating "service animals" with "emotional support animals," such as the "comfort dog" at issue.

Additionally, we would find Appellant's claim that this comfort dog had no training to be meritless, as the Commonwealth attached an exhibit to its motion requesting the presence of the comfort dog stating that the dog, a Labrador-Golden Retriever mix, was from the Chester County Sheriff's Department's K-9 unit and had two years of training with the Seeing Eye

32, 35-36 (citing N.T., 11/19/2018, at 49-55; N.T., 11/28/2018, at 4-9) ("trial court erred in permitting a dog in the courtroom for the purpose of providing comfort to testifying witness, A.H.").

The use of comfort dogs for witnesses with mental, psychological, or emotional conditions appears to be a matter of first impression in Pennsylvania,[7] but we start with the principle that Pennsylvania courts have the power to control courtroom proceedings:

> In **Behr v. Behr**, 548 Pa. 144, 695 A.2d 776 (1997), we noted:
>
>> This Court has long upheld a court's power to maintain courtroom authority. In **Commonwealth v. Africa**, 466 Pa. 603, 353 A.2d 855 (1976), we stated:
>>
>>> "During the course of a trial, a summary proceeding to protect the orderly administration of justice is perfectly proper, even when the court is personally attacked. The court must be able to control those appearing before it, and must be able to use its power summarily to avoid interference with the principal matter before the court."
>
> **Id.** at 623, 353 A.2d at 865. Thus it is undisputed that a judge must have broad discretion to maintain control in his courtroom.

**Commonwealth v. Falana**, 696 A.2d 126, 128 (Pa. 1997); **see also ACE American Insurance Co. v. Underwriters at Lloyds & Companies**, 939 A.2d 935, 948 (Pa. Super. 2007) ("a judge has significant authority to 'police'

---

organization. Commonwealth's Motion for Special Procedures During the Presentation of the Testimony of Child Witnesses, Exhibit A.

[7] We also find no Pennsylvania case law concerning any "comfort" or "support" items being brought to the stand by a witness, such as toys like dolls or teddy bears.

- 15 -

the proceedings in his or her own courtroom"), *aff'd*, 971 A.2d 1121 (Pa. 2009). This power to control courtroom proceedings includes the power to control the mode and order of examining witnesses and presenting evidence:

> The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
>
> (1) make those procedures effective for determining the truth;
>
> (2) avoid wasting time; and
>
> (3) protect witnesses from harassment or undue embarrassment.

Pa.R.E. 611(a).

"We review application of [Pa.R.E.] 611 deferentially[.]" **Commonwealth v. Pi Delta Psi, Inc.**, 211 A.3d 875, 885 (Pa. Super.), *appeal denied*, 221 A.3d 644 (Pa. 2019). "Appellate review of the court's rulings under [Pa.R.E. 611] is limited to determining whether the trial judge abused his discretion." **Rettger v. UPMC Shadyside**, 991 A.2d 915, 925 (Pa. Super. 2010); **see also Farese v. Robinson**, 222 A.3d 1173, 1185 (Pa. Super. 2019), *reargument denied* (January 13, 2020) (decision under Pa.R.E. 611 is "committed to the discretion of the trial court and will not be disturbed absent an abuse of that discretion"); **Nobles v. Staples, Inc.**, 150 A.3d 110, 113 (Pa. Super. 2016) (same).

Although Pennsylvania courts have not addressed this issue, appellate courts in multiple other jurisdictions have held that it is within a trial court's discretion to permit a witness to use a support animal, as part of each judge's

power to manage trial conduct.[8] ***See, e.g.***, ***State v. Millis***, 391 P.3d 1225, 1233 (Ariz. Ct. App. 2017) ("[i]n keeping with the trial court's 'broad discretion' in managing trial conduct, this court will not disturb a trial court's ruling regarding the use of a facility dog absent an abuse of discretion" (citation omitted)); ***People v. Spence***, 212 Cal. App. 4th 478, 512, 517 (Cal. Ct. App. 2012) (general rule of evidence granting trial court discretion "to control court proceedings in the search for truth" allowed the use of therapy dog; trial court also "appropriately exercised its discretion" under the Evidence Code "to set reasonable controls upon the mode of interrogation of [a] child witness[] by providing a therapy dog in this exercise of 'special care to protect [the witness] from undue harassment or embarrassment"); ***People v. Tohom***, 109 A.D.3d 253, 266-67 (N.Y. App. Div. 2013) (trial court permitted dog to be present during the witness's testimony and the appellate division affirmed, citing the trial court's discretion to "fashion[ ] an appropriate measure to address a testifying child witness's emotional or psychological

_____

[8]     "[A]lthough we are not bound by decisions from ... courts in other jurisdictions, we may use them for guidance to the degree we find them useful, persuasive, and ... not incompatible with Pennsylvania law." ***Ferraro v. Temple University***, 185 A.3d 396, 404 (Pa. Super. 2018) (citing ***Newell v. Montana West, Inc.***, 154 A.3d 819, 823 & n.6 (Pa. Super. 2017)), *reargument denied* (June 27, 2018); ***see also*** [***Commonwealth v.***] ***Manivannan***, 186 A.3d [472,] 483 [(Pa. Super. 2018),] ("When confronted with a question heretofore unaddressed by the courts of this Commonwealth, we may turn to the courts of other jurisdictions.").

***Farese***, 222 A.3d at 1188.

stress, based upon the particular needs of that child"; "judge conducting a public trial is empowered to control the proceedings in whatever manner may be consistent with the demands of decorum and due process"); **Smith v. State**, 491 S.W.3d 864, 877 (Tex. Ct. App. 2016) (decision of whether to allow support dog to accompany witness fell within trial court's discretion); **State v. Dye**, 309 P.3d 1192, 1194, 1199 (Wash. 2013) (trial courts given "wide discretion to control trial proceedings, including the manner in which testimony will be presented"; consequently, ruling allowing facility dog to accompany witness reviewed for abuse of discretion; "[t]rial courts have a unique perspective on the actual witness that an appellate court reviewing a cold record lacks"; "trial court acted within its broad discretion when it determined that . . . the facility dog provided by the prosecutor's office to the victim . . . was needed in light of [the victim]'s severe developmental disabilities in order for [victim] to testify adequately"). Given that this power of Pennsylvania trial courts to control their courtrooms -- including the manner in which testimony will be presented therein -- clearly corresponds to the same power of trial courts in other jurisdictions, we may use those other state courts' decisions as guidance, and, consequently, we will conclude that the appropriate standard of review is an abuse of discretion. With that standard in mind, we turn to Appellant's specific arguments.

*Prejudice*

Appellant urges this Court to find that --

> Placing a dog in the role of assisting a witness confers on the witness a sense of innocence, purity, vulnerability, defenselessness, need of support or protection, and credibility. Not only do these attributes naturally engender sympathy, but this scenario has the very real probability to lead the jury to prejudicially infer that the witness is so afraid of [Appellant] that she needed the extraordinary measure of a dog to testify against [Appellant]. . . .

> [A] dog companion . . . arguably communicates to the jury that there is some extraordinary vulnerability requiring support which would naturally generate sympathy.

Appellant's Brief at 29, 36.

All of the courts which have examined a challenge to the use of a comfort dog in a courtroom have concluded that the dog's presence is not inherently prejudicial.[9] **See, e.g.**, **Millis**, 391 P.3d at 1234 (rejecting defendant's assertion "that a dog accompanying a victim is 'presumptively prejudicial' so as to jeopardize a fair trial in every case" and his contention that the dog "'present[s] a nonevidentiary message' to the jury that the witness is an innocent victim"); **People v. Chenault**, 227 Cal. App. 4th 1503 (Cal. Ct. App. 2014) (support dog not inherently prejudicial, just as support person not inherently prejudicial); **Spence**, 212 Cal. App. 4th 478 (no prejudice in allowing therapy dog to be present in courtroom); **Tohom**, 109 A.D.3d 253 (no prejudice from "the concededly unobtrusive presence of the dog in the courtroom").

Additionally, the instant case is strikingly similar to a recent case from the Court of Appeals of Georgia, **Jones v. State**, ___ S.E.2d ___, 2020 WL

---

[9] Additionally, we find no case law in any jurisdiction that unequivocally banned the use of comfort dogs in court.

1239092, *7 (Ga. Ct. App. filed March 13, 2020), in which the defendant also asserted that the trial court erred by allowing, upon request of the prosecution, a dog to accompany a victim with post-traumatic stress disorder while he testified, "because the dog's presence generated sympathy in the jury, which prejudiced his defense." In *Jones*, as in the current action, "the trial court investigated the matter outside the jury's presence[,]" ascertaining the witness's condition, the need for the support animal, and the support animal's training. *Id.* at *8. The trial courts in both cases "also consulted with counsel to employ procedures designed to minimize the dog's presence and visibility to the jury." *Id.*; *compare id. with* Commonwealth's Motion for Special Procedures During the Presentation of the Testimony of Child Witnesses, at 1-2 ¶ 4, *and* N.T., 11/19/2019, at 50, 55.[10] The Court of Appeals of Georgia found that, "[u]under these circumstances, . . . the trial court acted within its discretion in allowing [the] dog to accompany [the witness] during his testimony." *Jones*, 2020 WL 1239092, *8 (citing *Ezebuiro v. State*, 707 S.E.2d 182 (Ga. Ct. App. 2011) (no abuse of discretion where trial court allowed prosecution to present rebuttal testimony from witness seated on a hospital gurney); *Williamson v. State*, 507 S.E.2d 765 (Ga. Ct. App. 1998) (trial court did not abuse its discretion by allowing

---

[10] *Spence* also discussed that a trial court should take care to ensure that a comfort dog should be well-behaved and unnoticeable once everyone took his or her seat and that the dog should be well-behaved. 212 Cal. App. 4th at 512.

grandmother to stand near nine-year-old child molestation victim during his testimony)).

The Court of Appeals of Georgia continued:

Moreover, Jones has failed to show that he was harmed by the trial court's decision. Given the procedures the trial court followed to minimize the dog's presence, we cannot assume that the dog had any impact on the jurors, much less that it engendered sympathy in them for [the witness].[8] . . .

[8] Jones assumes that the dog generated sympathy without any evidence in support and contrary to the fact that some people fear or dislike animals.

Accordingly, we find that Jones' argument on this ground is without merit.

*Id.* Analogously, Appellant has failed to show that he was harmed by the trial court's decision. Given that the trial court in the current action likewise followed procedures to minimize the dog's presence, we equally cannot assume that the dog had any impact on the jurors, much less that it engendered sympathy for A.H. We further agree with the Court of Appeals of Georgia that Appellant had made the unsubstantiated assumption that the dog generated sympathy without any evidence in support thereof and ignoring the fact that some people are afraid of or dislike animals, especially dogs. For these reasons, we similarly find that Appellant's argument on this ground is without merit.[11]

_____

[11] Although none of the jurisdictions to examine this issue have found that the presence of a comfort dog is inherently prejudicial, one state court required a

*Necessity*

Appellant further maintains:

[Y]oung children [are afforded] special accommodations in the courtroom to avoid trauma associated with testifying upon the showing of necessity. . . .

In the instant case, the stated need for a comfort dog was due to the witness's concern over safety in testifying in a . . . murder case. A safety concern would seem commonplace for any witness in this type of case. The request, as written and argued by the Commonwealth, had nothing to do with the witness's mental status or age. The Commonwealth did not differentiate A.H. from the other witnesses her age in any respect other than to say that she had voiced concerns for her safety to police.

Appellant's Brief at 31-32 (citing N.T., 11/19/2018, at 52-53).

_____

balancing test; in **State v. Devon D.**, 138 A.3d 849, 867 (Conn. 2016), the Supreme Court of Connecticut articulated the following test:

Before [permitting a comfort dog in the courtroom], the [trial] court must balance the extent to which the accommodation will help the witness to testify reliably and completely against any possible prejudice to the defendant's right to a fair trial. The trial court should consider the particular facts and circumstances for the request to have a dog accompany the particular witness, the extent to which the dog's presence will permit the witness to testify truthfully, completely and reliably, and the extent to which the dog's presence will obviate the need for more drastic measures to secure the witness' testimony. The trial court should balance these factors against the potential prejudice to the defendant and the availability of measures to mitigate any prejudice, such as limiting instructions and procedures to limit the jury's view of the dog.

Although the trial court in the current appeal did not apply this balancing test – and we will not retroactively require it, we find this test to be prudent and advise trial courts in the future to employ it when ruling on requests for the presence of service or support animals in the courtroom.

Preliminarily, we note that the courts are split on whether the prosecution must prove that the special measure of a comfort or support item for a minor or special needs witness is **necessary** to secure the witness's testimony. **Compare State v. Dickson**, 337 S.W.3d 733, 743 (Mo. Ct. App. 2011) (declining to require that prosecution make showing of necessity, instead putting onus on defendant to prove prejudice or impropriety, where "[t]here was nothing to suggest" that the comfort items – in this case, toys – "were used to engender the sympathy of the jurors; no reference to the teddy bears was made in the presence of the jury; and the witnesses were testifying about traumatic events"), **and Sperling v. State**, 924 S.W.2d 722, 726 (Tex. Ct. App. 1996) (also declining to require that prosecution make showing of necessity, instead putting onus on defendant to prove prejudice or impropriety; "[w]ith nothing more in the record," appellate court could not conclude that comfort item -- a teddy bear – "constituted demonstrative evidence which engendered sympathy in the minds and hearts of the jury, validated the child-victim's unimpeached credibility, or deprived appellant of his constitutional right of confrontation"), **with Gomez v. State**, 25 A.3d 786, 798–99 (Del. 2011) (requiring prosecution to show that special measure is necessary to facilitate witness's testimony, adopting "substantial need" standard), **and State v. Palabay**, 844 P.2d 1 (Haw. Ct. App. 1992) (requiring prosecution to show that special measure is necessary to facilitate witness's

testimony, adopting "compelling necessity" standard).[12] Two additional cases cited by Appellant, **State v. Cliff**, 782 P.2d 44 (Idaho Ct. App. 1989), and **State v. Hakimi**, 98 P.3d 809 (Wash. Ct. App. 2004), did not explicitly adopt a "necessity" or "need" standard but relied on records where the witness clearly would have had difficulty testifying in the absence of a comfort item. Appellant's Brief at 35-36.

Turning to the cases concerning comfort dogs in the courtroom specifically, of those that addressed whether the trial court must find the presence of the dog to be a necessity or need, all concluded that such a determination was unwarranted. **Chenault**, 227 Cal. App. 4th at 1516 ("a case-specific finding that an individual witness *needs* the presence of a support dog is not required by the federal Constitution" (emphasis in original)); **State v. Devon D.**, 138 A.3d 849, 864 (Conn. 2016) (defendant argued that "the state was required to prove a compelling need" for the comfort dog's presence; the Supreme Court of Connecticut disagreed, finding that the question was whether the animal "would **help** [the witness] testify truthfully and completely" (emphasis added) and not whether the state could prove a compelling need for the animal); **Tohom**, 109 A.D.3d at 266 (does not set forth any "necessity" criterion "for a court to adopt measures intended to

---

[12] Of these cases, the only one that Appellant cites in his brief is **Palabay**, 844 P.2d 1, thereby completely ignoring the contrary line of cases. Appellant's Brief at 30, 36.

address the stress which a child witness may experience on the witness stand"); *Dye*, 309 P.3d at 1199 ("we do not require a showing of 'substantial need' or 'compelling necessity' like Delaware, in *Gomez*, 25 A.3d at 798–99, or Hawaii, in *Palabay*,[]844 P.2d 1").[13]

Accordingly, our review of case law concerning the use of comfort items and animals in courtrooms demonstrates that the majority of jurisdictions have concluded that a finding of "necessity" or "need" is not required in order for the trial court to allow the presence of such items or animals, provided that such item or animal alleviates the stress that the witness may experience on the stand and hence helps the witness to testify truthfully and completely. *Chenault*, 227 Cal. App. 4th at 1516; *Devon D.*, 138 A.3d at 864; *Dickson*, 337 S.W.3d at 743; *Tohom*, 109 A.D.3d at 266; *Sperling*, 924 S.W.2d at 726; *Dye*, 309 P.3d at 1199; *contra Gomez*, 25 A.3d at 798–99; *Palabay*,

---

[13] To the extent that *Spence*, 212 Cal. App. 4th at 511, 518, suggested that a finding of necessity was compulsory, after the defendant had alleged that the trial court failed to make required findings of necessity, it also held that such a finding by the trial court could be "implied" in the court's decision to allow a comfort dog in the courtroom. Additionally, the California Court of Appeal found any error by the trial court in failing to make more specific findings of necessity when allowing the presence of both a human support person and a support canine was harmless. *Id.*

Furthermore, the California Court of Appeal later clarified in *Chenault*, 227 Cal. App. 4th at 1516, that a finding of necessity is not required.

844 P.2d 1; *Cliff*, 782 P.2d 44; *Hakimi*, 98 P.3d 809.[14] Moreover, all of the cases holding that a finding of necessity is not required are from the past decade, whereas the only case in the past decade insisting upon the finding of necessity is *Gomez*, 25 A.3d at 798–99, with *Palabay* and *Cliff* being more than a quarter century old;[15] the modernity of the cases not insisting on necessity therefore gives them greater persuasive value.

Ultimately, we find no compelling reason to disregard the reasoning of our sister courts. Ergo, we hold that Appellant's assertion that a trial court must find that the "special measure" of the presence of a comfort animal is a necessity is unsupported by existing persuasive case law, *see* Appellant's Brief at 29-31, and that the trial court need not make such a finding prior to granting a request for a comfort animal.

\* \* \*

In conclusion, there is no inherent prejudice in the presence of a comfort animal in a courtroom, and a trial court need not find a compelling necessity for the animal's presence, provided that the animal alleviates a witness's stress, hence allowing the witness to testify veraciously and thoroughly. Thus,

---

[14] We note that *Hakimi*, 98 P.3d 809, requiring a finding of necessity, is a 2004 case from the Court of Appeals of Washington, an intermediate appellate court; *Dye*, 309 P.3d 1192, not requiring necessity, is a 2013 case from the Supreme Court of Washington. As *Dye* is a later case from a higher court, we consider it of greater persuasive value.

[15] This shift may reflect courts' greater emphasis on, interest in, and understanding of victims' rights in recent years.

the trial court in the current case did not abuse its discretion by granting the trial court's request to have a comfort animal present during the testimony of A.H., a frightened, autistic minor.

**Testimony of A.H.**

Beyond the presence of the comfort animal, Appellant raises additional challenges to A.H.'s testimony:

> The trial court erred allowing the Commonwealth to inquire of A.H. regarding the assault of Justin Griest which took place on September 2, 2018. The Commonwealth pursued this line of questioning pursuant to the defense eliciting an inconsistent statement given by A.H. to [a] defense investigator. The statement given to [the] defense investigator on June 25, 2018, however, pre-dated the evidence of intimidation the Commonwealth introduced. This additional testimony regarding the assault on Mr. Griest was inflammatory and unfairly prejudicial to Appellant in that there was no evidence that Appellant directed these criminal acts.

Appellant's Brief at 39.

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. . . . Evidence is admissible if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact—and its probative value outweighs the likelihood of unfair prejudice.

***Commonwealth v. Clemons***, 200 A.3d 441, 474 (Pa. 2019) (citations omitted).

Appellant's contention that the Commonwealth should not have elicited information about the assault on Griest during A.H.'s testimony is perplexing, given that the jury had already heard about the assault on Griest and seen photographs of his injuries during Griest's own testimony, which he gave the

- 27 -

day before A.H.'s testimony. Trial Court Opinion, dated August 23, 2019, at 8 (citing Exhibits C10-G1 to C10-G6, C10-I). As the trial court explained, "when A.H. did testify the following day, the jury was already cognizant of the assault itself, and the fact that this juvenile – mentioned by name in Mr. Griest's testimony – had been present." *Id.* at 8. The above-quoted questions on re-direct examination constituted the entirety of A.H.'s testimony about the assault. N.T., 11/28/2018, at 110-11; *see also* Trial Court Opinion, dated August 23, 2019, at 10-11. The transcript of A.H.'s testimony about Griest's assault occupies less than two full pages, N.T., 11/28/2018, at 110-11, whereas, like the trial court noted, Griest's "own testimony on that incident occupies at least seven pages of the notes of testimony and the introduction of photographs of his injuries." Trial Court Opinion, dated August 23, 2019, at 11.

Thus, after a thorough review of the record, we conclude that the trial court did not abuse its discretion by allowing A.H. to testify about the assault on Griest when "the jury was *already aware* of the assault of Mr. Griest at this point in the trial"; "[t]he challenged testimony was simply an added layer of detail to an incident with which the jury was already familiar." *Id.* (emphasis in original); *see also Clemons*, 200 A.3d at 474 (abuse of discretion standard).

**Testimony of Corporal Dowds**

Finally, Appellant urges this Court to hold that "[t]he trial court erred in repeatedly allowing testimony regarding Coatesville residents' general

reluctance to provide information to police in criminal investigations. This line of questioning was not specific to this case." Appellant's Brief at 46. After acknowledging that "[t]he Commonwealth's overarching theory in this case was that Appellant had directly and indirectly intimidated witnesses into silence and recanting prior statements[,]" Appellant focused on the testimony of Corporal Dowds as the source of the allegedly improper statements "regarding reluctance to report." *Id.* at 46-47.

Again, our standard of review for the admission of evidence is an abuse of discretion. *Clemons*, 200 A.3d at 474.

Pursuant to our review of the record, we find that the trial court acknowledged and responded to each of Appellant's concerns that Corporal Dowds's testimony was not directed towards this current case. When Appellant objected to the Commonwealth's question about "snitch culture" as "inappropriate[,]" the trial court sustained the objection "as to the form of the question" and required further foundation. N.T., 11/26/2018, at 165-66; *see also* Trial Court Opinion, dated August 23, 2019, at 12. When Corporal Dowds stated that Coatesville residents "don't want to be threatened, harassed[,]" the trial court re-focused the Commonwealth's inquiry. N.T., 11/26/2018, at 167; *see also* Trial Court Opinion, dated August 23, 2019, at 13. When Appellant objected to the Commonwealth's question about why residents "say talk to me later, not here, not now" on the basis of speculation, the trial court gave direction to the Commonwealth to re-focus its questioning on specific instances on the part of witnesses. N.T., 11/26/2018, at 168; *see also* Trial

Court Opinion, dated August 23, 2019, at 13-14. The trial court later repeated its admonishment to "avoid" the possibility of generalization. N.T., 11/26/2018, at 169-70; *see also* Trial Court Opinion, dated August 23, 2019, at 15. Thus, the trial court addressed each one of Appellant's challenges to Corporal Dowds's testimony, and it is unclear what further action the trial court could have possibility taken to ameliorate any problems "that the information being elicited was not specific to this case." Appellant's Brief at 50.

Therefore, after a thorough review of the record and the briefs of the parties, we agree with the trial court that it --

> acknowledged and responded to defense counsel's concern that this testimony was not directed towards this case. The court required the Commonwealth to not only lay a proper foundation for Corporal Dowds's testimony, but also to focus the inquiry into specific instances rather than broad pronouncements. Indeed, the court specifically stated that it would be improper to "generalize and have the jury apply generally some general statements as to the particulars in this case." Moreover, this testimony about witness reluctance was not presented in a vacuum for its own sake, but rather it served as background information about the extensive surveillance system present in Coatesville that was about to be heavily relied upon by the Commonwealth in its case in chief. As set forth above, the court accordingly limited and focused the Commonwealth's inquiries, belying [Appellant]'s appellate position that the court "repeatedly" permitted testimony on "Coatesville residents' general reluctance to provide information to police in criminal investigations."

Trial Court Opinion, dated August 23, 2019, at 15-16. We thus find that the trial court did not abuse its discretion in any of its rulings concerning Corporal

Dowds's testimony about Coatesville residents' general reluctance to report crimes. *Clemons*, 200 A.3d at 474.

\*    \*    \*

Based on the foregoing, Appellant is not entitled to relief on any of his appellate claims. We thereby affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/28/20